## Samuel M. Lieberman *v.* Connecticut State Board of Examiners in Optometry.

Maltbie, C. J., Brown, Jennings, Ells and Dickenson, Js.

Argued March 5—decided July 7, 1943.

*Thomas J. Conroy,* assistant attorney general, with whom, on the brief, was *Francis A. Pallotti,* attorney general, for the appellant (defendant).

*Jacob Schwolsky,* for the appellee (plaintiff).

MALTBIE, C. J.   The plaintiff, licensed to practice optometry under the provisions of Chapter 161 of the General Statutes, brought this petition to the Superior Court under § 1157c of the Cumulative Supplement of 1935 to secure the restoration of his license, which had been revoked by the board of examiners in optometry, and, from a judgment granting him relief, the board has appealed.   At the time the board acted, the statutes authorized it, after notice and hearing, to revoke the license of any optometrist on the ground that he was guilty of "unprofessional conduct" or of "aiding or abetting the practice of optometry by an unlicensed person"; General Statutes, Cum. Sup. 1935, § 1155c; and they also provided that "The license of any optometrist who shall employ solicitors . . . in connection with the conduct of the profession of optometry shall be revoked."   General Statutes, § 2849. After a hearing, the board, on December 17, 1940, made a finding of facts and revoked the license upon all three of these grounds.   We find it necessary to consider only the first.   In *Sage-Allen Co., Inc.* v. *Wheeler,* 119 Conn. 667, 679, 179 Atl. 195, 98 A. L. R. 897, we construed the provision in § 793b of the Supplement of 1933, still retained in § 1018e of the Cumulative Sup-

plement of 1939, which authorized the board of examiners in optometry to revoke a license for "immoral . . . dishonorable or unprofessional conduct," in this way: "The words must have been used in the light of the fundamental purpose of the statutes to regulate the profession in the public interest, and they can only be construed as intending to include conduct within their fair purport which either shows that the person guilty of it is intellectually or morally incompetent to practice the profession or has committed an act or acts of a nature likely to jeopardize the interest of the public." The question before us is whether the plaintiff could, upon the facts before the board, reasonably be held guilty of conduct "of a nature likely to jeopardize the interest of the public."

A copy of the entire proceedings before the board, including all the evidence, was appended to the answer. There is no dispute as to the situation under which the plaintiff was practicing. He entered into an oral agreement, terminable at will, with a corporation known as B. Spector & Bro. which sold, among other things, optical goods. Under the agreement he occupied two rooms in its store, of which he had charge. He was to examine persons seeking optometrical service. If any person for whom he prescribed bought glasses in the store, he made no charge for his services; if they did not intend to buy the glasses there, he made a charge and the money received was paid to the corporation; but this rarely occurred. He was paid a salary by the corporation and also received commissions on optical goods sold by it on his prescription, the commissions amounting to somewhat more than a third of his entire compensation. The company extensively advertised that optometrical services could be had in its store, and we shall later in the opinion discuss this matter.

Optometry was first regulated in this state in 1913.

Public Acts, 1913, Chap. 236. Since that time higher requirements for securing a license have from time to time been established and the practice of optometry has been increasingly subjected to regulation. Thus, in the act of 1913, one could qualify to take the examination for a license if he had a preliminary education equivalent to at least two years in high school and had studied at least two years in the office of a registered optometrist, whereas now it is required that he shall have graduated from a high school after a four years' course and from a school of optometry approved by the board of examiners and maintaining a course of study of not less than four years. General Statutes, Cum. Sup. 1939, § 1017e. The 1913 act seems to have sedulously avoided the use of the word "profession" as applied to the calling, and in § 10 an optometrist was entirely forbidden to use the title "doctor" or any synonym; but now the board is given power to make rules to govern "the practice of optometry as a profession"; and an optometrist may use the title "doctor" if he appends words indicating that he is an optometrist. General Statutes, Cum. Sup. 1935, §§ 1154c and 1158c. In other respects there has been in the statutes a growing recognition of the importance of regulating optometry, and a calling which was originally regarded as a trade has increasingly taken on the aspects of a learned profession. No doubt this is due to a greater realization by the legislature and the public of the fact which we stated in the *Sage-Allen* case, where we said (p. 677): "It is a matter of common knowledge that where a person suffers from defective vision the use of eyeglasses not correctly adapted to remedy the defect may seriously aggravate it and, because of the resultant eye strain, may bring about nervous and even physical disorders, with accompanying discomfort and loss of efficiency." To this statement we add that a

properly qualified optometrist should be able often to discover diseased conditions of the eye which require treatment by an oculist, and should, when they are discovered, refer his patient to a doctor qualified to deal with them.

When we decided the *Sage-Allen* case, the concluding sentence of § 793b, which was then in effect and specified various grounds upon which the licenses of an optometrist might be revoked, was as follows: "Nothing herein contained shall prohibit the operation in a department store of an optical department under the supervision of a duly licensed optometrist." By an amendment to the section enacted in 1939, for this sentence the following was substituted: "No person except a licensed optometrist shall operate an optometrical office. Nothing herein contained shall be construed as prohibiting the conducting of clinics or visual surveys when they are conducted without profit." General Statutes, Cum. Sup. 1939, § 1018e. It is not easy to determine the purpose designed to be accomplished by this amendment, but we need not consider that question in its broad aspects. The sentence in the 1933 act, as we said in the *Sage-Allen* case (p. 675), made it possible for a department store to conduct an optical department and employ a licensed optometrist in connection with it. It did not, in its terms or by necessary implication, authorize a department store to establish in connection with its business an office designed solely to render optomerical service and held out to the public as a place to which they might resort for such service, regardless of the relationship between a licensed optometrist in charge of such an office and the management of the store. In the *Sage-Allen* case (p. 677), we pointed out that there is a distinction, as regards the attention which the public is entitled to expect, between a situation where an optical depart-

ment in a store is in charge of a licensed optometrist and one where it is in charge of a layman, as in the former a customer visiting the department expects to receive the advice and assistance of the trained optometrist, assistance which he does not expect in the latter case. So there is a distinction as regards the rightful expectations of the public between a situation where an optometrist is merely in charge of an optical department and one where, in connection with the business of the store, it maintains a separate office in which he renders and is held out to the public as rendering the usual services of a licensed optometrist. Certainly the amendment of 1939 cannot be held to broaden the rights of those conducting stores where optical goods are sold so as to authorize them under any and all circumstances to have in connection with them an office where optometrical services are rendered. Counsel call our attention to two bills before the 1941 session of the General Assembly, one of which would, if passed, have expressly sanctioned such an arrangement as existed in this case, and the other of which would have as clearly condemned it. Both bills were rejected. It is a fair inference, as the plaintiff's counsel argues, that the legislature decided to let the statutes stand as they were; but that conclusion is insufficient to afford justification to support the position of the plaintiff in this case.

It may be that the standards of professional conduct which should govern the practice of optometry are not regarded as in all respects the same as those which govern the practice of a physician. See *Dvorine* v. *Castelberg Corporation*, 170 Md. 661, 669, 185 Atl. 562. Still, in view of the recognized character which the former profession has today, there are certain fundamental requirements common to both. One of these is that the patient who resorts to an optometrist for

advice and help is entitled to the same undivided loyalty that he should receive from a physician. *Ezell* v. *Ritholz*, 188 S. C. 39, 51, 198 S. E. 419. The following quotation from *Rowe* v. *Burt's, Inc.*, (Ohio App.) 31 N. E. (2d) 725, 727, applies to the situation before us: "Professionally, an optometrist should have no interest in any way in who fills his prescriptions. It is manifestly apparent that the situation here prevailing cannot permit the freedom in the optometrists which should exist in purely professional men." That, we take it, was the basis of the decision in *McMurdo* v. *Getter*, 298 Mass. 363, 10 N. E. (2d) 139, where it was held that a firm which availed itself of the services of an unlicensed optometrist was to be regarded as practicing optometry, although the test usually employed in determining whether an agency exists was not met, and wherein it was said (p. 368) that the employees of corporations, "though professionally trained and duly licensed to practice, owe their primary allegiance and obedience to the employer rather than to the clients or patients of their employer," and that the principle which forbids a licensed member of a profession to practice among the public as the employee of an unlicensed person or corporation "recognizes the necessity of immediate and unbroken relationship between a professional man and those who engage his services." In *Neill* v. *Gimbel Bros., Inc.*, 330 Pa. 213, 199 Atl. 178, the *McMurdo* decision was followed, and extensive quotations, including those we have made, were inserted in the opinion.

Upon the facts established by the evidence before the board, we doubt whether, at least for most purposes, it could reasonably have concluded that the plaintiff was the agent or employee of the corporation rather than an independent contractor. The vice of the situation before us lies in the particular relationship

existing between the plaintiff and the corporation and certain circumstances resulting from the arrangement between them. The fact that a considerable part of the compensation received by the plaintiff came from commissions received from the corporation based on the sale of glasses prescribed by him, if such a practice were held generally permissible, would make it likely, at least in some instances, that the welfare of the patient would not be the sole criterion applied by the optometrist in rendering services to him. Also, because the profit to the store from the arrangement would come entirely from its sale of optical goods, an optometrist under such an arrangement as the one before us, in order to preserve his position with the corporation, might well be tempted to prescribe glasses or more expensive glasses when this would not serve the true interests of the patient. The situation is one where the complete loyalty of an optometrist to his patient is put into serious jeopardy.

One of the conclusions of the board was that the arrangement amounted to a splitting of fees, forbidden by one of its regulations. Splitting of fees as defined in the statutes of several states occurs where a member of a profession divides the compensation he receives from a patient with another member of the same profession or any person who has sent the patient to him or has called him into consultation. Iowa, Code 1939, § 2493; Kansas, General Statutes 1935, § 21-2440; Michigan, 1940 Cum. Sup., § 17115-428; Minnesota, Statutes 1941, § 147-11. It may be that the plaintiff could not be charged with a splitting of fees in the usual understanding of the offense. However, where an optometrist working under such an arrangement as was the plaintiff is not compensated for his services by a patient who buys glasses in the store, but only by the salary and commissions paid to him by the corpora-

tion with which he is connected, and where, if the patient does not buy glasses in the store, the compensation the optometrist receives is turned over to it, the practice might well impair the personal responsibility of the optometrist to his patient which is one of the safeguards of the proper rendition of services by a member of a profession.

There were produced before the board thirty-four newspaper advertisements; all were distinctly advertisements of the store, carrying the word "Spectors" in large type; they consisted of exhortations to the public to have their eyes examined at the store; all followed the advertising matter with the words "S. M. Lieberman, Optometrist." but this was printed in. much smaller type than the name of the store; most of them urged that "the optometrist at Spectors" be consulted, but in one there was no mention of any optometrist, the public being solicited to come to the store for eye examinations, and in four the plaintiff was referred to as "our optometrist" or Spector's "registered optometrist." There were also produced before the board copies of ninety-four radio advertisements; these followed much the same form as those usually appearing in the newspapers except that the plaintiff's name was not mentioned; but in four there was no reference to any optometrist, the public being urged to go to "Spectors" to have their eyes examined, and in thirteen the optometrist was referred to as "our optometrist" or "Spector's optometrist," or the like. Photographs of similar advertisements in the show windows of the store were also in evidence which urged that examinations be made by "our optometrist." The plaintiff was consulted as to or knew the subject matter of these advertisements. Not only was the corporation not licensed to practice optometry, but under our statutes it could not be. As we have said, one of the safe-

guards which protect the public in any profession whose members are required to have a state license is the personal responsibility of the licensed member for the character of the services rendered. The advertisements, particularly those where no mention was made of an optometrist or where he was referred to as "Spector's optometrist" or the like, could reasonably be regarded by the board as creating in the public mind the impression that it was the corporation which was offering to render optometrical services, or at least it was the corporation which was responsible for the way and manner in which they were rendered. An optometrist is not forbidden to advertise; a physician may do so provided his advertisement is not "deceptive, misleading, extravagant, improbable or untrue"; General Statutes, Sup. 1941, § 475f; and certainly an optometrist can be held to no higher standard of conduct. But to become a party to a type of advertising such as that described may well be regarded as "unprofessional conduct" in that it leads the public into an erroneous conception of the respective responsibilities of the corporation and the plaintiff. *State, ex rel. Bricker, Atty. Genl.* v. *Buhl Optical Co.,* 131 Ohio St. 217, 224, 2 N. E. (2d) 601; *Rowe* v. *Standard Drug Co.,* 132 Ohio St. 629, 641, 9 N. E. (2d) 609.

We need go no further in considering the rulings of the board. Our conclusion is that it could reasonably find proven the charge that the plaintiff was guilty of unprofessional conduct and that it had the right to revoke his license.

There is error, the judgment is set aside and the case is remanded to the Superior Court with direction to dismiss the appeal.

In this opinion the other judges concurred,