## C. Edwin Delinks et al. *v.* William McGowan et al.

Baldwin, C. J., King, Murphy, Shea and Bordon, Js.

Argued June 7—decided July 25, 1961

*Richard F. Corkey,* with whom was *Arthur Barrows,* for the appellants (plaintiffs).

*Raymond J. Cannon,* assistant attorney general, with whom, on the brief, was *Albert L. Coles,* attorney general, for the appellees (defendants Ward et al.); with him also were *Ralph P. Dupont* and, on the brief, *Max M. Shapiro,* for the appellees (named defendant et al.).

BALDWIN, C. J. The plaintiffs are taxpayers and own land in the town of Old Lyme on the banks of the Blackhall River or in the immediate vicinity of the river. The defendants are the governor of the state, the state board of fisheries and game, hereinafter referred to as the board, and William and Mildred M. McGowan. The plaintiffs seek to enjoin the defendants from consummating a sale by the McGowans to the state of a tract of land, approximately three acres in area, on the easterly bank of Horse Neck Creek and the Blackhall River at their junction in Old Lyme. The trial court rendered judgment for the defendants, and the plaintiffs have appealed.

At its meeting on December 11, 1957, the board, purporting to act pursuant to General Statutes § 26-16, authorized the purchase of the McGowan land as a site for access by the public to the Blackhall River for the launching of boats as well as for the parking of automobiles while those who came in them are on the water. The pertinent portion of § 26-16 reads as follows: "The board is authorized to acquire for the use of the state, by gift, lease, purchase or agreement, fishing, hunting, trapping or shooting rights or privileges on any land or water in this state, with necessary rights of ingress thereto and egress therefrom, or, with the approval of the governor, to purchase land or water for the purposes of such rights or privileges." The plaintiffs claim that the statute gives the board only "the power to acquire access to or from land or water in this state on which the Board has acquired by lease, purchase or agreement fishing, hunting, trapping or shooting rights or privileges, or which the Board has purchased for the purpose of such rights or privileges."

The court found the following facts: The Blackhall River is a navigable tidal stream or estuary confluent with the Back River, which is a navigable tidal stream confluent with the Connecticut River, a navigable river flowing into Long Island Sound. The state, representing the public, owns the land between the high- and low-water marks of these rivers, and that land and the waters of the rivers are public. See *Rowe* v. *Smith*, 48 Conn. 444, 446; *Rochester* v. *Barney*, 117 Conn. 462, 468, 169 A. 45; *State* v. *Knowles-Lombard Co.*, 122 Conn. 263, 265, 188 A. 275. The state has acquired, for duckhunting, title to upwards of 200 acres of land on Great Island, which lies in the Connecticut River off the confluence of the Blackhall and Back Rivers with the Connecticut River. Great Island is approximately a mile distant, down the Blackhall River, from the McGowan property. The purpose of the board in acquiring the McGowan property is to provide access to the Blackhall River and a place where members of the public may leave their automobiles, launch their boats and, by descending the river, reach the hunting grounds on Great Island and other duckhunting and fishing areas in the Connecticut River and adjacent waters. Although the plaintiffs have assigned error in the last part of the finding just stated, it is amply supported by competent evidence. There is a boat livery on the Blackhall River a short distance south of the McGowan property. The general public, as well as those residing in the neighborhood of the river, use the river to reach hunting and fishing grounds.

The net effect of the plaintiffs' claim is that § 26-16 gives the board power to acquire access, by gift, lease or purchase, to lands and waters in which the state has acquired hunting and fishing rights

and privileges, but that the statute does not give the board power to acquire access to lands or public waters which the state has owned from its inception and in which therefore it was not necessary to acquire hunting and fishing rights and privileges for the public.

When the language of a statute appears to be ambiguous, the court looks beyond the literal meaning of the words and considers the history of the legislation, the circumstances surrounding its adoption, and its apparent policy and purpose. *Lee* v. *Lee,* 145 Conn. 355, 358, 143 A.2d 154; *Cassidy* v. *Tait,* 140 Conn. 156, 160, 98 A.2d 808. The first sentence of § 26-16 appears for the first time in substantially its present form in § 579g of the 1943 Supplement. Section 579g was apparently a combination of §§ 1096e and 1101e of the 1939 Cumulative Supplement. Section 1096e authorized the board to acquire for the use of the state "hunting, trapping, or shooting rights or privileges upon land in this state, with necessary rights of ingress and egress to or from such land, or, with the approval of the governor, to purchase land for the purposes of said rights or privileges or any of them." Section 1101e dealt in substantially the same language with "fishing rights and privileges in any stream, lake or pond in the state and upon land adjoining thereto." The portion of the sentence which reads "or, with the approval of the governor, to purchase land for the purposes of said rights or privileges" had its origin in 1933. Cum. Sup. 1933, §§ 879b, 881b; Cum. Sup. 1935, §§ 1309c, 1312c. The pertinent language of §§ 1309c, 1312c and 579g is set forth in the footnote.[1] Prior to 1933, the statutes

---

[1] "[Cum. Sup. 1935] Sec. 1309c. HUNTING PRESERVES. The state board of fisheries and game is authorized to acquire for the use of

had authorized the board to acquire only hunting and fishing "rights and privileges" and the necessary "rights" of ingress and egress. Rev. 1930, §§ 3152, 3162. The obvious purpose of the 1933 amendments was to authorize the board to make outright purchases of land and waters for hunting and fishing purposes and for ingress and egress. The phrase "said rights or privileges or any of them" indicates a clear intent that the board could acquire, by purchase, whatever land or water was needed for hunting and fishing purposes and ingress and egress. The approval of the governor for such action was substituted in 1937 for the approval of the board of finance and control which was formerly required. Cum. Sup. 1939, §§ 1096e, 1101e. It should be noted that the phrase in §§ 1096e and 1101e, "for the purposes of said rights or privileges or any of them," was changed in 1943 to read "for the purposes of such rights or privileges." Sup. 1943, § 579g. Beginning in 1933, the board had authority

the state, by gift, lease or purchase, hunting, trapping or shooting rights or privileges upon land in this state, with necessary rights of ingress or egress to or from such land, or, with the approval of the board of finance and control, to purchase land for the purposes of said rights or privileges or any of them. . . ."

"[Cum. Sup. 1935] Sec. 1312c. BOARD MAY ACQUIRE FISHING RIGHTS. The state board of fisheries and game is authorized to acquire for the use of the state, by gift, purchase or lease, fishing rights and privileges in any stream, lake or pond in the state and upon land adjoining thereto, with necessary rights of ingress or egress to or from such land, or, with the approval of the board of finance and control, to purchase land, ponds or streams for the purposes of said rights or privileges or any of them. . . ."

"[Sup. 1943] Sec. 579g. HUNTING AND FISHING PRESERVES. The state board of fisheries and game is authorized to acquire for the use of the state by gift, lease, purchase or agreement, fishing, hunting, trapping or shooting rights or privileges on any land or water in this state, with necessary rights of ingress thereto and egress therefrom, or, with the approval of the governor, to purchase land or water for the purposes of such rights or privileges. . . ."

to acquire land or waters for fishing or hunting, or for access to waters or lands where fishing and hunting rights could be enjoyed.

The legislature is aware of the increasing interest of the public in hunting and fishing. It has responded in recent years with larger appropriations for the propagation of game birds and fish and the acquisition of land and waters for hunting and fishing purposes. It can be presumed that the legislature has taken cognizance of the greater use of boats powered by outboard motors and transported on trailers to inland waters of the state and salt water, and the need for providing facilities for launching and parking purposes. See *Waterbury Savings Bank* v. *Danaher,* 128 Conn. 78, 81, 20 A.2d 455; *Hartford Production Credit Assn.* v. *Clark,* 118 Conn. 341, 343, 172 A. 266; *Pelton & King, Inc.* v. *Bethlehem,* 109 Conn. 547, 551, 147 A. 144. It can also be presumed that the legislature was aware that although the public has the right to boat, hunt and fish below the high-water mark on the navigable waters of the state, the upland owner has the right to prevent the public from crossing the private lands which border on these public domains and are above the high-water mark. See *Lay* v. *King,* 5 Day 72, 76; *Orange* v. *Resnick,* 94 Conn. 573, 580, 109 A. 864; *Poneleit* v. *Dudas,* 141 Conn. 413, 419, 106 A.2d 479; 1 Farnham, Waters and Water Rights, p. 209; 2 id., p. 1362. The legislature could not have intended, as claimed by the plaintiffs, that the board should have the power to acquire access to nonnavigable inland lakes, ponds, streams and hunting grounds but not the power to acquire access for members of the public to the navigable streams and rivers and the long coast line of this state. Such a construction of the statute would thwart the obvious

purposes of its broad terms. See *Bergner* v. *State,* 144 Conn. 282, 287, 130 A.2d 293; *West Hartford* v. *Talcott,* 138 Conn. 82, 90, 82 A.2d 351; *Northeastern Gas Transmission Co.* v. *Collins,* 138 Conn. 582, 592, 87 A.2d 139.

The plaintiffs claim further that § 26-16 gives no authority for the acquisition of land for the parking of automobiles. It is true that the McGowan land can be used only as a means of access to or egress from the Blackhall River for fishing and hunting. The parking of the automobiles which bring the public to the McGowan property for these purposes is necessarily incidental to that use, and the power to acquire necessary land for parking is fairly included by implication. See *Bergner* v. *State,* supra, 288. This does not mean, however, that the general public can use the area for any and all purposes. It can be used only for the purposes which are incidental to hunting and fishing, and the board has the broad power of regulating the proper and legitimate use of the property it proposes to purchase. General Statutes § 26-3. We conclude that § 26-16 gives the board authority to purchase, with the approval of the governor, the McGowan property as a place of access to and egress from the waters of the Blackhall, Back and Connecticut Rivers, adjacent waters, and Great Island, for the purposes of hunting and fishing.

The plaintiffs claim error in the court's conclusion that the purchase of the McGowan property was approved by the governor as required by § 26-16. On this feature of the case, the court found the following facts: The board, on the report of one of its subordinates, authorized the purchase at a meeting on December 11, 1957. By letter dated January 24, 1958, the board's director requested the state

bond commission, which consists of the governor, the treasurer, the comptroller, the attorney general, the commissioner of finance and control, the public works commissioner and, ex officio, the chairman of the state building program commission (General Statutes § 3-20), to allot $5300 for the purchase of the McGowan property. The bond commission, at its meeting on March 10, 1958, voted to approve the allocation of $5300 from funds appropriated under the provisions of No. 677 of the 1957 Special Acts. 28 Spec. Laws 894. This act authorized a bond issue by the state for several projects and provided (§ 2) that the "proceeds of the sale of such bonds shall be used, subject to the approval of the state bond commission, to . . . purchase land and improve sites" for projects specified therein, including (§ 2[n]) "for the fish and game commission, one hundred thousand dollars." The governor was present at the meeting. The commission unanimously approved the allocation of $5300 for the purchase of the McGowan property. The plaintiffs have assigned error in the finding that this allocation was "unanimously" approved. The minutes of the meeting state: "It was voted to approve the allocation of funds to the Board of Fisheries and Game for the purchase of land at Black Hall River, Old Lyme ($5,300) . . . ." General Statutes § 1-21 requires that the vote of each member of any such body on any issue before it be recorded in the minutes of the session at which the vote was taken. The minutes here would foreclose any member of the bond commission from denying that he had voted in the affirmative for the approval of the allocation unless he had requested that his vote be recorded in the negative. The minutes record no dissenting vote, and it must be assumed that the

governor voted with the other members of the commission for approval. That aside, after the action of the bond commission, the governor, on March 21, 1958, approved a reallotment of funds for the board on the ground that the approval by the bond commission of the purchase of three parcels, including the McGowan property, made a reallotment necessary. See General Statutes §§ 4-69(3), 4-85. Section 26-16 does not prescribe any formality to be followed by the governor in approving a purchase by the board. The court's conclusion that the governor approved the purchase within the requirements specified by § 26-16 was correct.

Some of the plaintiffs in the action live within the territorial limits of "The Black Hall Association," which was chartered by the General Assembly. 25 Spec. Laws 734, No. 528. They claim that use of the McGowan property for the purpose proposed is prohibited by § 9 of the act incorporating the association. Id., 735. Section 9 is, in effect, a zoning regulation concerning the use of property within the territorial limits of the association. It forbids the erection of a building or the use of premises for, among other uses, "places of amusement." In this conflict between the exercise of legislative power in the general public interest of the state by a general statute and its exercise in the interest of a local community by a special act, the former must prevail unless the intent that it shall not is clearly expressed in the legislation. See *Jennings* v. *Connecticut Light & Power Co.*, 140 Conn. 650, 665, 103 A.2d 535; *State* v. *Hartford,* 50 Conn. 89, 90; *State* v. *Shelton,* 47 Conn. 400, 405; *Monterey Oil Co.* v. *City Court,* 120 Cal. App. 2d 41, 42, 260 P.2d 851; 2 Metzenbaum, Law of Zoning, p. 1292. We conclude that the charter of the Black

Hall Association does not prohibit the purchase of the McGowan property by the board for the uses proposed.

There is no error.

In this opinion the other judges concurred.