MAURICE H. MACK *v.* WALTER F. SAARS ET AL., CONNECTICUT STATE BOARD OF EXAMINERS IN OPTOMETRY

BALDWIN, C. J., KING, MURPHY, SHEA and ALCORN, Js.

 

Argued November 7, 1962—decided February 26, 1963

*Charles R. Covert,* with whom were *John M. Chapnick* and, on the brief, *Bruce E. Dillingham,* for the appellant (plaintiff).

*Raymond J. Cannon,* assistant attorney general, with whom, on the brief, was *Albert L. Coles,* attorney general, for the appellees (defendants).

BALDWIN, C. J. The plaintiff, a licensed optometrist, has appealed from a judgment of the Superior Court which sustained an order of the state board of examiners in optometry suspending his license to practice. In chapter 380 of the General Statutes, which regulates the practice of optometry, § 20-138a provides that no person shall practice optometry unless he has a license issued by the board. Under § 20-133 (e) of that chapter, the board, after a hearing, may revoke or suspend an optometrist's license

for aiding or abetting the practice of optometry by an unlicensed person.

The facts found by the board can be stated in summary as follows: Prior to September 1, 1960, the plaintiff was licensed to practice optometry in this state. He was employed as an optometrist by Michaels, Inc., of Waterbury, a Connecticut corporation hereinafter referred to as Michaels, to render optometrical services in its Bristol store, where it owned and maintained a modern, fully equipped optometrist's office. The plaintiff was paid a fixed salary. He made eye examinations and was the only employee in the store qualified to write and to fill prescriptions for eyeglasses or to fit and adjust them. No claim is made that any other employee of Michaels performed all or any part of these services. Fees for examinations were charged by Michaels, which also furnished the ophthalmic materials used, such as lenses and frames. The plaintiff occasionally filled eyeglass prescriptions written by others. Michaels charged for the services performed by the plaintiff and for the eyeglasses prescribed by him. The sums so collected were credited to the gross income of the store. Persons seeking credit in paying for the optometrical services of the plaintiff and the glasses he prescribed were required to make their credit arrangements with Michaels, and no credit could be given by the plaintiff to anyone who had been disapproved. The optometrical office was located in a room at the rear of the store. Index cards showing the names, addresses and prescriptions of optometrical customers of this office were maintained there. These cards contained information needed to complete future optometrical reexaminations. Michaels claimed that the plaintiff was coowner of these cards in that he

could copy them for his own purposes. Michaels sells jewelry, watches and other merchandise, is essentially a retail jewelry store, and is not and cannot be licensed to practice optometry.

The board concluded that the plaintiff was an employee of Michaels, that Michaels was not licensed to practice optometry and could not qualify for a license, and that the plaintiff was "guilty of abetting Michaels . . . in the practice of optometry, in that . . . [he] has full knowledge that in practicing his profession as an employee of an unlicensed person he is assisting and supporting the practice of optometry by his employer . . . ." The board accordingly ordered the plaintiff's license suspended. The plaintiff petitioned the Superior Court for the restoration of his license. General Statutes § 20-135. He has appealed from the judgment of the court sustaining the board's action.

The conclusion of the board and the court on the facts found by the board imports a construction of chapter 380 to the effect that a corporation or any other unlicensed person cannot, under any circumstances, employ a licensed optometrist for a fixed salary to render optometrical services to persons who thereby become indebted to the employer for those services. A study of this chapter of the General Statutes discloses no specific provision denying to a corporation, a partnership or an individual the right to employ a licensed optometrist. It is true that § 20-127, defining the practice, and § 20-130, prescribing the qualifications and procedure necessary to obtain a license to practice, make it clear that a corporation, as such, cannot qualify for a license. Section 20-133 provides that the license of any licensed optometrist may be revoked, suspended or annulled by the board for "(e) aiding or abetting

the practice of optometry by an unlicensed person or a person whose license has been suspended or revoked." The section also provides that "[n]o person except a licensed optometrist shall operate an optometrical office." Does the quoted language, read in the light of other provisions of chapter 380, necessarily mean that a licensed optometrist, employed, as was the plaintiff under the circumstances of this case, to operate an optometrical office furnished and equipped by the employer, is necessarily aiding or abetting the practice of optometry by his employer in violation of the statute? The statute is far from clear on this question. The primary and ordinary meaning of "operate" is "to perform a work or labor." Webster, Third New International Dictionary. The import of the decision of the trial court is that the legislature intended a meaning of the word "operate" which would make the word applicable not only to the individual actually performing the work but also to his employer. Is this the intent of the statute? See *Lieberman* v. *Connecticut State Board of Examiners in Optometry,* 130 Conn. 344, 348, 34 A.2d 213. We must look beyond the express language of the legislation to resolve the ambiguity. *Wilson* v. *Miller,* 144 Conn. 212, 214, 128 A.2d 894; *Landry* v. *Personnel Appeal Board,* 138 Conn. 445, 447, 86 A.2d 70; *Hartford* v. *Suffield,* 137 Conn. 341, 343, 77 A.2d 760.

Courts, in construing statutes, consider their legislative history, their language, their purpose, and the circumstances surrounding their enactment. *Delinks* v. *McGowan,* 148 Conn. 614, 618, 173 A.2d 488; *Cassidy* v. *Tait,* 140 Conn. 156, 160, 98 A.2d 808. Chapter 380 of the General Statutes is in derogation of a common-law right and is penal in

nature. See § 20-138a. Therefore, the principle of strict construction applies. *Connecticut Chiropody Society, Inc.* v. *Murray,* 146 Conn. 613, 617, 153 A.2d 412; *Hart* v. *Board of Examiners of Embalmers,* 129 Conn. 128, 132, 26 A.2d 780; *State* v. *Parker,* 112 Conn. 39, 46, 151 A. 325; *State* v. *Levy,* 103 Conn. 138, 141, 130 A. 96; *McPheeters* v. *Board of Medical Examiners,* 103 Cal. App. 297, 299, 284 P. 938.

The legislative history of § 20-133,[1] which gives

---

[1] "Sec. 20-133. GROUNDS FOR REVOCATION OR SUSPENSION OF LICENSE. OPTOMETRICAL OFFICE TO BE CONDUCTED BY LICENSED OPTOMETRIST. The license of any licensed practitioner of optometry in this state may be revoked, suspended or annulled, upon decision after notice and hearing, by the board for any of the following reasons: (a) Conviction in a court of competent jurisdiction, either within or without this state, of any crime involving moral turpitude or of any crime in the practice of his profession or of a felony or a misdemeanor; (b) immoral, fraudulent, dishonorable or unprofessional conduct; (c) illegal or incompetent or habitually negligent or unprofessional conduct in the practice of his profession; (d) conviction of publication or circulation of any fraudulent or misleading statement; (e) aiding or abetting the practice of optometry by an unlicensed person or a person whose license has been suspended or revoked; (f) presentation to the board of any diploma, license or certificate illegally or fraudulently obtained, or from an unrecognized or irregular institution or state board, or obtained by the practice of any fraud or deception. The license of any optometrist who peddles optical goods, or solicits orders therefor, from door to door, or who establishes a temporary office, may be revoked, and said board may refuse to renew such license. The license of any optometrist who employs solicitors or obtains money by fraud or misrepresentation in connection with the conduct of the profession of optometry shall be revoked, and said board shall not renew such license. The violation of any of the provisions of this chapter by any unlicensed employee in the employ of an optometrist, with the knowledge of his employer, shall be deemed to be a violation thereof by his employer; and continued violation by such an unlicensed employee shall be deemed prima facie knowledge on the part of such employer. No person except a licensed optometrist shall operate an optometrical office. Nothing herein contained shall be construed as prohibiting the conducting of clinics or visual surveys when they are conducted without profit."

to the board the power to revoke or suspend licenses and contains subsection (e), invoked by the board as the basis for its action in suspending the plaintiff's license, is illuminating. The genesis of the section is found in the original legislation concerning the practice of optometry, enacted in 1913. Public Acts 1913, c. 236, § 6; Rev. 1918, § 2941. Since 1921, certain commercial and fraudulent practices have been expressly made grounds for revocation. Public Acts 1921, c. 276, § 5; Rev. 1930, § 2849; Rev. 1949, § 4493. In 1933, the General Assembly spelled out six additional grounds for revocation or suspension and included what is presently subsection (e). Cum. Sup. 1933, § 793b; Cum. Sup. 1935, § 1155c. As a last-minute amendment, the legislature, in 1933, appended to the section the following: "Nothing herein contained shall prohibit the operation in a department store of an optical department under the supervision of a duly licensed optometrist." See Conn. S. Jour., 1933 Sess., pp. 1927-28; Conn. H. Jour., 1933 Sess., p. 2074.

In *Sage-Allen Co.* v. *Wheeler,* 119 Conn. 667, 179 A. 195, following the amendment in 1933, this court had before it the construction of the optometry chapter. In that case the plaintiffs were two department stores, an optical company which conducted an optical department in each of the stores and two licensed optometrists who, under an agreement with the optical company, managed its business in the stores. Those plaintiffs challenged a regulation of the state board of examiners in optometry forbidding the advertising by any licensed optometrist of a fixed price for services or for optical goods as immoral, fraudulent, dishonorable and unprofessional conduct. The regulation provided further that any registered optometrist who,

through his license, made possible the establishment or conduct of an optical department by any person not licensed should be held responsible for all advertising published under the sponsorship of his license and that his name should appear in each advertisement as the sponsor of the department. The case was remanded for a development of the facts upon which the validity of the regulation depended. In construing the 1933 last-minute amendment quoted above, we held (p. 675) that under its terms a department store may "conduct an optical department where the services of an optometrist are not employed or it may employ a licensed optometrist in connection with such a department." We said: "To construe the provision as requiring . . . [a department] store to employ an optometrist as a condition of carrying on an optical business would be to discriminate between it and other stores or individuals engaged in the same business, which the Legislature never could have intended." In short, if the provision were so construed, it would constitute an unconstitutional discrimination.

In 1939, the General Assembly repealed the provision considered in the *Sage-Allen* case and substituted different language. Cum. Sup. 1939, § 1018e; Rev. 1949, § 4494; General Statutes § 20-133. The bill from which the 1939 legislation emanated, as reported by the legislative committee, contained this language: "No person except a licensed optometrist shall own or operate an optometrical office. Nothing herein contained shall be construed as prohibiting the conducting of clinics or visual surveys when they are conducted without profit." Sub. for H.B. 1499, 1939 Sess., § 2. While the bill was under consideration in the house and the senate, it was amended by striking out the words

"own or" which appeared before the word "operate." The bill was enacted with these two words deleted. Conn. S. Jour., 1939 Sess., pp. 2250-51; Conn. H. Jour., 1939 Sess., p. 2345. The fair inference from this legislative action is that the legislature intended to go no further than to require that optometrical services be personally rendered by a licensed optometrist. In short, an optometrical office could be maintained in a store if the office was operated by a licensed optometrist. It is a well-recognized rule of statutory construction that the legislature is presumed to know all the existing statutes, the judicial interpretation of them, and the effect that its action or nonaction will have on them. *Buxton* v. *Ullman,* 147 Conn. 48, 56, 156 A.2d 508, appeal dismissed, 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989; *Southern New England Telephone Co.* v. *Public Utilities Commission,* 144 Conn. 516, 523, 134 A.2d 351, and cases cited. In 1941, bills were introduced into the General Assembly which, if enacted, would have prevented, on the one hand, the practice of optometry on store premises under any arrangement whereby a person not licensed to practice optometry would share in the fees charged; Sub. for S.B. 821, 1941 Sess.; and, on the other hand, would have specifically allowed a corporation to employ a licensed optometrist to operate an optometrical office. S.B. 229, 1941 Sess. None of these bills were enacted into law.

In 1943, in *Lieberman* v. *Connecticut State Board of Examiners in Optometry,* 130 Conn. 344, 34 A.2d 213, this court had before it an appeal of a licensed optometrist whose license had been revoked, under what is now § 20-133 and was then § 1018e of the 1939 Cumulative Supplement, for (1) unprofessional conduct and (2) aiding or abetting the prac-

tice of optometry by an unlicensed person. The optometrist worked for a corporation on a salary and commission basis in a store it owned where optical goods were sold. We upheld the action of the board in revoking the license on the ground that the board could have found that the optometrist was guilty of unprofessional conduct. We concluded (p. 351) that the situation was one where the complete loyalty of the optometrist to his client was put in jeopardy by the commission arrangement and (p. 353) that the store's advertising, done with the knowledge of the optometrist, could reasonably be regarded by the board as creating in the public mind the belief that the corporation, and not the optometrist, was offering to render optometrical services. Thus, the case was disposed of without our considering whether the relationship of the optometrist with the store owner constituted "aiding or abetting the practice of optometry by an unlicensed person."

Attempts were made in the legislative session of 1957 (H.B. 2153), 1959 (S.B. 996), and 1961 (Sub. for H.B. 3667; H.B. 3679, 3689, 3693, 3745, 4228) to amend what is presently § 20-133. Some of the proposed legislation would have specifically allowed the practice of optometry by a licensed optometrist in charge of an optometrical department in a store. Other bills offered would have specifically, or by indirection, prevented it. All of this proposed legislation, so far as it concerned the provisions of § 20-133 involved in this case, was rejected, and these provisions remained as they were after the 1939 amendment. Following 1939, the relevant language of § 20-133 went through two statutory revisions without change. Rev. 1949, § 4494; General Statutes § 20-133. The proposed legislation alerted

the legislature to the possibility that optometrists might be employed to operate an optometrical office owned by another person who would employ the optometrists for that purpose. If the legislature intended to forbid such employment, it could have expressed that intent by an amendment in clear, unequivocal language, as it has done, for example, in the case of chiropodists; General Statutes § 20-64; and dentists. § 20-122; see *State* v. *Faatz,* 83 Conn. 300, 306, 76 A. 295; *Jones* v. *Dental Commission,* 109 Conn. 73, 75, 145 A. 570. The professional status of optometry, unlike law and medicine, is a creature of statute. Courts cannot, by a process of construction, read into legislation provisions for which there is no clear basis in the legislative language, and which the legislature itself has, in spite of proposed amendatory legislation, refused to make explicit. *Buxton* v. *Ullman,* supra, 57, and cases cited.

In the *Lieberman* case, supra, 351, we pointed out the danger to the public which could arise if an optometrist, by entering into an arrangement entitling him to a commission on optical goods sold on his prescription, should place himself in a position where his complete loyalty to his client would be jeopardized. That case was concerned with unprofessional conduct as a ground for revocation, a matter not involved in the present case. At least one court has relied on the *Lieberman* case as a basis for construing a statute such as ours as prohibiting corporate employment of optometrists. *State ex rel. Sisemore* v. *Standard Optical Co.,* 182 Ore. 452, 465, 188 P.2d 309. We do not agree with that point of view. The evils described in the *Lieberman* case are not necessarily present in every case of corporate employment. In the present case, for example, there is nothing to show that the plain-

tiff's compensation was measured by the number of eyeglasses he prescribed, or that there was any abuse of the use of Michaels in filling prescriptions for eyeglasses ordered by the plaintiff, or that the employer-employee relationship between the plaintiff and Michaels has otherwise endangered the public. If there had been proof that the plaintiff, because of his relationship to his employer, had failed to perform his full professional duty to those who sought his services, subsections (b) and (c) of § 20-133 gave to the board adequate power to discipline him, as they would have empowered the board to deal with any other optometrist who failed in his professional obligation. The board's action in suspending the plaintiff rested solely on the ground that the mere employer-employee relationship between the plaintiff and Michaels constituted the aiding or abetting by the plaintiff of the practice of optometry by Michaels. Cf. *Obuchowski* v. *Dental Commission,* 149 Conn. 257, 264, 178 A.2d 537. The legislature has regulated the practice of optometry in the public interest. Whether the protection of the public health and welfare requires that all employment of members of this profession by corporations or others should be prohibited is a matter for legislative consideration and decision. *Cyphers* v. *Allyn,* 142 Conn. 699, 705, 118 A.2d 318; *Connecticut Theatrical Corporation* v. *New Britain,* 147 Conn. 546, 553, 163 A.2d 548. Our existing legislation cannot be construed to prohibit this relationship. The board lacked the power and competence under this legislation to decide otherwise.

Decisions in other states rest largely on the phraseology of the statutes involved. Most of the cases which have held illegal the corporate employment of persons licensed to practice optometry are

based on more restrictive statutory provisions than ours. See *Melton* v. *Carter,* 204 Ark. 595, 597, 604, 164 S.W.2d 453; *Florida State Board of Optometry* v. *Gilmore,* 147 Fla. 776, 777, 3 So. 2d 708; *Bennett* v. *Indiana State Board of Registration & Examination in Optometry,* 211 Ind. 678, 682, 7 N.E.2d 977; *State* v. *Kindy Optical Co.,* 216 Iowa 1157, 1165, 248 N.W. 332; *State ex rel. Beck* v. *Goldman Jewelry Co.,* 142 Kan. 881, 890, 51 P.2d 995; *Kendall* v. *Beiling,* 295 Ky. 782, 793, 175 S.W.2d 489; *McMurdo* v. *Getter,* 298 Mass. 363, 369, 10 N.E.2d 139; *State ex rel. Loser* v. *National Optical Stores Co.,* 189 Tenn. 433, 439, 225 S.W.2d 263; *State ex rel. Standard Optical Co.* v. *Superior Court,* 17 Wash. 2d 323, 328, 135 P.2d 839; *Eisensmith* v. *Buhl Optical Co.,* 115 W. Va. 776, 780, 178 S.E. 695. For example, the Florida court construed language declaring it "unlawful for any corporation . . . to engage, or undertake to engage in, the practice of optometry through means of engaging the services, upon a salary, commission or lease basis . . . [of] any person licensed to practice optometry in the State of Florida." *Florida State Board of Optometry* v. *Gilmore, supra.* The Massachusetts court construed the following statutory language: "No optometric practice or business . . . shall be conducted under any name other than that of the optometrist or optometrists actually conducting such practice or business." *McMurdo* v. *Getter, supra.* This statute is similar to our statute relating to chiropractors. § 20-32. Of like import was the West Virginia statutory language concerning optometry. See *Eisensmith* v. *Buhl Optical Co., supra,* 778. Similarly, the Iowa statute under consideration in *State* v. *Kindy Optical Co., supra,* 1160, declared the opening of an office or place of business for the

practice of optometry to be prima facie evidence of engaging in that practice.

Conversely, corporate employment of persons licensed to practice optometry has been found to be impliedly authorized by some statutes. In *Williams* v. *Mack,* 202 Minn. 402, 406, 278 N.W. 585, and *Matter of Dickson* v. *Flynn,* 246 App. Div. 341, 343, 344, 286 N.Y.S. 225, aff'd, 273 N.Y. 72, 6 N.E.2d 102, statutes requiring the personal attendance and supervision of a licensed optometrist at all retail sales of eyeglasses were held to render lawful the corporate employment of optometrists. In *Attorney General* v. *Kindy Optical Co.,* 265 Mich. 265, 266, 251 N.W. 343, a statute which spoke in terms of any "corporation . . . who maintains or operates . . . an optometric department" was held to authorize the corporate employment of licensed optometrists. See Mich. Comp. Laws § 6788 (h) (1929). Similarly, optometry statutes which merely speak in terms of the employment of licensed optometrists have been held to indicate a legislative intent not to prohibit corporate employment of optometrists. See *Klein* v. *Rosen,* 327 Ill. App. 375, 386, 64 N.E.2d 225; *Jaeckle* v. *L. Bamberger & Co.,* 119 N.J. Eq. 126, 127, 181 A. 181; *State ex rel. Harris* v. *Kindy Optical Co.,* 235 Wis. 498, 503, 292 N.W. 283.

Decisions which do not turn on any such special statutory provision as heretofore discussed have refused to construe, as prohibiting the corporate employment of persons licensed to practice optometry, statutes which, like ours, merely regulate optometry. See *Silver* v. *Lansburgh & Bro.,* 72 App. D.C. 77, 78, 111 F.2d 518; *State ex rel. Attorney General* v. *Gus Blass Co.,* 193 Ark. 1159, 1168, 105 S.W.2d 853; *Georgia State Board of Examiners in Optometry* v. *Friedmans' Jewelers Inc.,* 183 Ga. 669, 675,

189 S.E. 238; *Dvorine* v. *Castelberg Jewelry Corporation,* 170 Md. 661, 672, 185 A. 562; *State ex rel. McKittrick* v. *Gate City Optical Co.,* 339 Mo. 427, 438, 97 S.W.2d 89; *Golding* v. *Schubach Optical Co.,* 93 Utah 32, 41, 70 P.2d 871. One or more of three basic considerations underlie each of these decisions: (1) In the absence of statute, the practice of optometry has always been a common right, and therefore any statute in derogation of this right must be strictly construed. See, e.g., *State ex rel. Attorney General* v. *Gus Blass Co.,* supra. (2) The purpose of statutory regulation, viz., the protection of the public against the potential harm inherent in the services of an unskilled optometrist, can be adequately achieved even if the qualified optometrist is a corporate employee. *Georgia State Board of Examiners in Optometry* v. *Friedmans' Jewelers Inc.,* supra; *Dvorine* v. *Castelberg Jewelry Corporation,* supra, 671, 672. (3) The nature of the optometrist's skill and the nature of his relationship with his clients are so different from the correlative skills and relationships in the medical and legal professions that a prohibition against corporate employment similar to that which has traditionally prevailed in those two professions is not warranted. See, e.g., *Silver* v. *Lansburgh & Bro.,* supra, 520; *Dvorine* v. *Castelberg Jewelry Corporation,* supra, 674. Some courts have construed such statutes to prohibit corporate employment. They appear not to have applied the rule of strict construction applicable to a statute in derogation of a common-law right or a statute imposing penal sanctions. See *Funk Jewelry Co.* v. *State ex rel. La Prade,* 46 Ariz. 348, 50 P.2d 945; *Sears, Roebuck & Co.* v. *State Board of Optometry,* 213 Miss. 710, 57 So. 2d 726; *State ex rel. Bricker* v. *Buhl Optical Co.,* 131

Ohio St. 217, 2 N.E.2d 601; *State ex rel. Sisemore* v. *Standard Optical Co.,* 182 Ore. 452, 188 P.2d 309; *Neill* v. *Gimbel Bros., Inc.,* 330 Pa. 213, 199 A. 178; *Ezell* v. *Ritholz,* 188 S.C. 39, 198 S.E. 419. Since many of the cases were based on statutes more clear on this question than our own, it cannot be said, without innumerable qualifications, that there is any majority rule on this issue.

There is error, the judgment is set aside and the case is remanded with direction to grant the plaintiff's petition for the restoration of his license.

In this opinion KING, MURPHY and ALCORN, Js., concurred.

SHEA, J. (dissenting). The plaintiff was ordered to appear before the state board of examiners in optometry to answer a complaint that he was "aiding or abetting the practice of optometry by an unlicensed person." General Statutes § 20-133 (e). The board, after a hearing, suspended the plaintiff's license to practice. The Superior Court dismissed his appeal, and from that decision he has appealed to this court. A majority of the court have decided that the board lacked the power and competence to suspend the plaintiff's license to practice although the board found that he was guilty of the charge.

The practice of optometry is defined to be the employment of any means other than drugs for the measurement of the power of vision and the adaptation of lenses for the aid thereof. General Statutes § 20-127. The majority concede, as indeed they must, that a corporation cannot qualify for a license to practice optometry. § 20-130; *Lieberman* v. *Connecticut State Board of Examiners in Optometry,* 130 Conn. 344, 352, 34 A.2d 213. Without a license, a corporation cannot practice optometry. § 20-138a.

Yet that is precisely what the corporation in this case is doing, and the majority of the court sanction and approve that practice.

Among the facts found by the board and important to the decision of this case are the following: The plaintiff is employed by a corporation as an optometrist to render optometrical services to its customers. The corporation pays him a weekly salary, fixes the fees for the work done by him, collects the money for his services and credits the income to its gross corporate income. The corporation has a jewelry store and advertises as "opticians," but no licensed optician is employed in its store. Eyeglasses sold by the corporation are for the most part prescribed by the plaintiff. All of the equipment of the optometrical department in the store is owned by the corporation, which purchases its ophthalmic materials from another company which is owned by the family which operates the corporation. The stationery, prescription blanks and appointment cards used by the plaintiff as an admitted employee of the corporation do not represent the true relationship existing between the plaintiff and his employer.

From these facts it is clear that the plaintiff is under the supervision and control of the corporation. He is but the agent or servant of his master. He owes his primary allegiance and obedience to the corporation as his employer. The interests of the patients and clients who come to him must of necessity be secondary. For the sake of self-preservation, he will make every effort to satisfy the wishes and demands of his employer, who may dismiss him should he fail to produce the measure of profit expected from his services. The plaintiff admits that he is an employee of the corporation.

It is fundamental that the acts of agents or employees of a corporation are the acts of the corporation. 19 C.J.S., Corporations, §§ 993, 999. "The agent of a corporation stands in place of the corporation itself in the line of his assigned duties, and acts within his authorized employment are the acts of the corporation." 19 C.J.S., Corporations, § 993. The plaintiff, the agent of Michaels, is engaged in the practice of optometry in the line of duties assigned to him by his employer, and the acts performed by him are the acts of the corporation. It follows, therefore, that the corporation is engaged in the practice of optometry. Since the corporation cannot legally conduct such a practice, it cannot do indirectly what it is forbidden to do directly. This conclusion is in accord with the substantial weight of authority in this country. 13 Am. Jur., Corporations, § 837; 41 Am. Jur., Physicians and Surgeons, § 28. "It is generally held that in the absence of express statutory authority, a corporation may not engage in the practice of optometry either directly or indirectly through the employment of duly registered optometrists." 13 Am. Jur., Corporations, § 837. Of the cases cited in the majority opinion, not less than sixteen support this view.

The sole charge against the plaintiff is that, as a licensed optometrist, he aided or abetted an unlicensed person in the practice of optometry. Consequently, our consideration must be restricted to the portion of § 20-133 which relates to the charge on which the plaintiff was presented. For some unexplainable reason, the majority of the court have failed to discuss the specific charge made against the plaintiff. Aside from a passing reference to the language of subsection (e) of § 20-133, the

majority give no consideration to this subsection, though it forms the basis of the complaint, but rather embark on an extended, strained construction of another sentence in the same statute, a sentence which has no direct bearing whatever on the case. It is true that § 20-133 also provides that "[n]o person except a licensed optometrist shall operate an optometrical office." The plaintiff, however, is not charged with a violation of this portion of the statute. The corporation, as an unlicensed person, is not a party to these proceedings, and the question whether it has violated the law is not now before us. Hence, it is entirely beside the point to engage in a construction of the language of this portion of the statute. The majority ask, "Does the quoted language, read in the light of other provisions of chapter 380, necessarily mean that a licensed optometrist, employed, as was the plaintiff under the circumstances of this case, to operate an optometrical office furnished and equipped by the employer, is necessarily aiding or abetting the practice of optometry by his employer in violation of the statute?" If it is assumed, though not conceded for a moment, that the language pertaining to the operation of an office by an unlicensed person has any bearing whatever on this case, the clear ringing answer given by the legislature to the inquiry of the majority is in the affirmative.

The prohibition of the statute includes every person who does not have a license. The term "person" includes a corporation. General Statutes § 1-1. The word "operate" as used in the statute must be taken in its plain, ordinary, accepted meaning. "Operate" means to "put into or continue in operation or activity . . . to conduct . . . or carry on, or to work." *State* v. *Woolley,* 88 Conn. 715, 718,

92 A. 662. "Operate" means to "produce an effect
. . . to manage and put or keep in operation wheth-
er with personal effort or not *(operated* a grocery
store)." Webster, Third New International Dic-
tionary. When we apply the language of § 20-133
to the facts of this case, it cannot be doubted that
Michaels is operating an optometrical office. In
fact, the plaintiff in his appeal to the Superior
Court alleged that the corporation "maintains an
optometrical office fully equipped with modern
scientific instruments and appliances" and that he,
the plaintiff, is employed by the corporation. More-
over, the corporation itself joined the plaintiff in
making these same allegations when, in a separate
proceeding, the plaintiff and the corporation sought
to enjoin the defendant board from revoking or
suspending the plaintiff's license on the charges
filed against him in the present case. *Mack* v. *Con-
necticut State Board of Examiners in Optometry,*
Superior Court, Fairfield County, No. 109,971.
From the pleadings in that proceeding, it clearly
appears that the plaintiff and the corporation both
alleged that the corporation maintained an opto-
metrical office. It is merely a play on words to
assert that the corporation "maintains" an op-
tometrical office but does not "operate" one. There
can be no doubt that the corporation maintains or,
in the language of the statute, "operates" an op-
tometrical office. It has no license to do so and is
acting contrary to law. These observations, how-
ever, are not pertinent to our present inquiry. It
is difficult to escape the conclusion that the major-
ity of the court have resorted to a discussion of the
word "operate," as used in this portion of the stat-
ute, for the purpose of creating an ambiguity.
Courts resort to rules of construction for the pur-

pose of resolving an ambiguity, never for the purpose of creating one. 50 Am. Jur., Statutes, § 226. Any construction of the portion of the statute which is not involved in the charge against the plaintiff is wholly unwarranted, beclouds the issues and leads to a result which constitutes, in effect, legislation by judicial fiat.

The majority have referred to the repeated refusals of the legislature to amend § 20-133. It is argued that the legislation which was proposed alerted the legislature to the possibility that optometrists might be employed to operate an optometrical office owned by an unlicensed person. This argument is indeed an ingenious one. Since 1939, not less than thirteen attempts have been made to amend the law. Examination of every one of the bills brought to the court's attention indicates that nine of the proposals, if adopted, would have made legal what the majority of this court now declare to have been legal under the statute existing since 1939. From 1941 through 1961, these nine proposed amendments were based on the assumption that a corporation could not engage in the practice of optometry by employing the services of a licensed optometrist. Two of the remaining proposals would have made it unlawful for an unlicensed person to practice optometry by engaging the services of a licensed optometrist on a salary, commission or sublease basis but would not have affected any such relationship existing at the time the legislation went into effect. S.B. 667, 1945 Sess.; H.B. 3693, 1961 Sess. The obvious purpose of these last two proposals was to legalize any unlawful relationships then existing. Out of all the amendments proposed, only two contained genuine prohibitions against the employer-employee rela-

tionship. Sub. for S.B. 821, 1941 Sess.; S.B. 996, 1959 Sess. Manifestly, almost all of the proposed amendments would alter existing law to legalize the employment of a licensed optometrist by an unlicensed person. These proposals, in the form submitted, could alert the legislature to the prohibition of such a practice under existing law and to the need of amending the law if there was any intention to allow such employment. But to suggest that the proposed legislation alerted the legislature to the possibility that such employment by an unlicensed person was already legal does not withstand rational or logical analysis. Clearly, the interpretation of § 20-133 by the majority of this court differs sharply from the construction placed on the statute by the legislators over a protracted period of time. If, as this court now holds, the law always permitted an unlicensed person to operate an optometrical office by employing the services of a licensed optometrist, then by what peculiar turn of events would it be necessary to amend the law to permit that very practice? It has been correctly stated that the legislature took no action on the proposals to amend the law. The legislature had declared the law in plain, clear, unambiguous language, and it had a right to expect that the law would be observed and enforced by the courts.

References made by the majority to any lack of a showing of unprofessional conduct on the part of the plaintiff are of no significance whatever, since that matter was not material to the issue presented by the charge that the plaintiff was aiding or abetting the practice of optometry by an unlicensed person. Our function on this appeal is to determine whether the board acted illegally in suspending the plaintiff's license. We do not retry the case. Our

decision must not be based on any erroneous assumptions, assumptions without foundation in the record before us. Thus, the failure of the board to make certain findings relative to other phases of the plaintiff's conduct, phases which do not pertain to the charge involved, is beyond the scope of our inquiry. They have no place in our consideration.

The chapter of the statutes regulating the practice of optometry clearly recognizes it as a profession. General Statutes § 20-128. The board is authorized to make and enforce such regulations as it deems necessary to maintain proper professional and ethical standards for practitioners of this profession. This calling, originally regarded as a trade, has increasingly taken on the aspects of a learned profession. *Lieberman* v. *Connecticut State Board of Examiners in Optometry,* 130 Conn. 344, 347, 34 A.2d 213. "It is a matter of common knowledge that where a person suffers from defective vision the use of eyeglasses not correctly adapted to remedy the defect may seriously aggravate it and, because of the resultant eye strain, may bring about nervous and even physical disorders, with accompanying discomfort and loss of efficiency." *Sage-Allen Co.* v. *Wheeler,* 119 Conn. 667, 677, 179 A. 195. "It may be that the standards of professional conduct which should govern the practice of optometry are not regarded as in all respects the same as those which govern the practice of a physician. . . . Still, in view of the recognized character which the former profession has today, there are certain fundamental requirements common to both. One of these is that the patient who resorts to an optometrist for advice and help is entitled to the same undivided loyalty that he should receive from a physician." *Lieberman* v. *Connecticut State Board of Ex-*

*aminers in Optometry,* supra, 349. "Professionally, an optometrist should have no interest in any way in who fills his prescriptions. It is manifestly apparent that the situation here prevailing can not permit the freedom in the optometrists which should exist in purely professional men." *Rowe* v. *Burt's, Inc.,* 17 Ohio Op. 1, 3, 31 N.E.2d 725. "The ethics of any profession is based upon personal or individual responsibility. One who practices a profession is responsible directly to his patient or his client. Hence he cannot properly act in the practice of his vocation as an agent of a corporation or business partnership whose interests in the very nature of the case are commercial in character." *Ezell* v. *Ritholz,* 188 S.C. 39, 51, 198 S.E. 419. Connecticut has applied this principle to the legal profession. In *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 235, 140 A.2d 863, we said: "As . . . [a corporation] cannot practice law directly, it cannot do so indirectly by employing competent lawyers to practice for it, since that would be an evasion which the law will not tolerate. *Matter of Co-operative Law Co.,* 198 N.Y. 479, 483, 92 N.E. 15." No sound reason can be advanced why the same principle should not be applied with equal emphasis to the profession of optometry.

Optometry is no longer a mere incident to a merchandising business. It has become a real science, devoted to the measurement, accommodation, and refractory powers of the eye without the use of drugs. It is one of the more important professions and, to prepare for the proper practice of optometry, extensive education and training are required. Legislators throughout the entire country have recognized that the proper practice of this profession is of the most vital importance to the public

and have made due provision for its regulation. *Seifert* v. *Buhl Optical Co.,* 276 Mich. 692, 698, 268 N.W. 784. Our own legislature has kept pace with the progress made in this field. The board was given authority by law to take the action which it did in this case, and the facts fully justified the suspension of the plaintiff's license.

In my view, the trial court did not err in dismissing the plaintiff's appeal.