******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

VIVIAN GAGLIANO ET AL. *v.* ADVANCED
SPECIALTY CARE, P.C., ET AL.
(AC 37413)

Beach, Alvord and Gruendel, Js.

*Argued April 12—officially released August 30, 2016*

(Appeal from Superior Court, judicial district of
Danbury, Ozalis, J.)

*Michael G. Rigg*, for the appellant (defendant Danbury Hospital).

*Alinor C. Sterling*, with whom, on the brief, was *Joshua D. Koskoff*, for the appellees (plaintiffs).

*Jennifer L. Cox* and *Jennifer A. Osowiecki* filed a brief for the Connecticut Hospital Association as amicus curiae.

*Roy W. Breitenbach* and *Michael J. Keane, Jr.*, filed a brief for the Fairfield County Medical Association as amicus curiae.

*Opinion*

ALVORD, J. The defendant, Danbury Hospital (hospital), appeals from the judgment of the trial court, rendered after a jury verdict, in favor of the plaintiffs, Vivian Gagliano and her husband, Philip Gagliano,[1] on their negligence claims against the hospital and its codefendant, Dr. Venkata Bodavula.[2] On appeal, the hospital claims that the trial court erred by failing to grant its motions to set aside the verdict and for judgment notwithstanding the verdict. The hospital argues, and we agree, that insufficient evidence was presented from which the jury reasonably could have found that Dr. Bodavula was the hospital's agent for purposes of assisting in the plaintiff's surgery and, therefore, the hospital could not be held vicariously liable for the plaintiff's injuries.[3] We reverse in part the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. On July 23, 2008, the plaintiff underwent hernia repair surgery at the hospital. The surgery was to be performed by Dr. Joseph R. Gordon, her physician, who had recommended the procedure to the plaintiff during an examination at his office.[4] Dr. Gordon was not employed by the hospital, but maintained staff privileges allowing him to attend to his patients admitted to the hospital.

Prior to the start of the procedure, but without the plaintiff's knowledge, a fourth year medical resident, Dr. Bodavula, was assigned to assist Dr. Gordon with the surgery. Dr. Bodavula was enrolled in the surgical medical residency program, sponsored by Sound Shore Medical Center in New York, which included rotations at the hospital.[5] Dr. Gordon asked Dr. Bodavula about his experience with a surgical device called an optical trocar, which was to be used in the surgery. Dr. Bodavula informed Dr. Gordon that he knew how to use the device. Under Dr. Gordon's supervision, Dr. Bodavula performed the initial insertion of the device into the plaintiff's abdomen.

As the surgery proceeded, Dr. Gordon became concerned that Dr. Bodavula was improperly using the optical trocar. At that point, Dr. Gordon took over for Dr. Bodavula and completed the plaintiff's surgery. Two days after the surgery, while recovering in the hospital, the plaintiff began to exhibit signs of infection and her body went into septic shock. It was discovered that the plaintiff's colon had been perforated during the surgery. The plaintiff began to suffer from multiple organ failure and was subsequently connected to a ventilator before being rushed into surgery to repair the perforation.

The plaintiff survived, but spent sixty-nine days in the hospital recovering from the perforation. Eight months after the initial surgery and due to the perforated colon, the plaintiff required surgery to remove part of her

large intestine, and, as a result of the procedure, she developed permanent digestive problems. The trial court stated in its memorandum of decision that the plaintiff has difficulty being away from the bathroom for any length of time, is regularly in pain, has significantly reduced stamina and is unable to walk more than one-quarter of a mile.

The plaintiffs filed negligence claims against Dr. Gordon, his practice, Advanced Specialty Care, P.C., Dr. Bodavula, and the hospital. The plaintiffs alleged that Dr. Gordon and Dr. Bodavula were agents of the hospital and, therefore, the hospital was vicariously liable for their actions. Prior to the commencement of trial, the plaintiffs settled with Dr. Gordon and Advanced Specialty Care, P.C., for an undisclosed sum. In May, 2014, a jury trial commenced to address the remaining claims against Dr. Bodavula and the hospital.

Dr. Bodavula was enrolled in the surgical residency program at Sound Shore Medical Center in New Rochelle, New York.[6] The program included rotations at Danbury Hospital. Dr. Bodavula testified that as a fourth year medical resident he spent approximately 50 percent of his time at the hospital. A rotation at the hospital would last one to two months. On the day of the plaintiff's surgery, the chief resident of the surgical residency program assigned Dr. Bodavula to assist Dr. Gordon. There was no evidence presented as to whether the chief resident was an employee of the hospital, but Dr. Bodavula testified that in regard to the chief resident, "I'm also the same residence, as the same part of the same pool of residents."

During his testimony, Dr. Bodavula was questioned about the hospital's House Staff Manual (manual). Dr. Bodavula testified that he could not recall whether he had received a copy of the manual . Despite not being able to recall if he had received the manual, he believed that he was expected to comply with the obligations that it established.[7]

Later in the trial, the hospital stipulated that the manual had been distributed to residents in 2008. The entire 231 page manual was admitted into evidence as a full exhibit. The trial court ruled that the manual was relevant to the question of whether Dr. Bodavula was an agent of the hospital. The manual was accompanied by a cover letter from the chief executive officer of the hospital: "This House Staff Manual has been developed as a guide to enlighten and clarify the many services and support functions available to members of the House Staff at Danbury Hospital, as well as to inform you of House Staff and Danbury Hospital policies. . . . I wish you a rewarding educational experience!"

The first section of the manual addressed resident policies, including selection to the program, resident evaluations, responsibilities, hospital safety, and bene-

fits. The section on benefits included details about rent-free housing, vacation and sick leave, as well as insurance. It also stated: "Danbury Hospital will provide a salary to the Resident, as specified in the Danbury Hospital Resident Agreement." There was no evidence submitted as to a "Residency Agreement" between Dr. Bodavula and the hospital. He testified that he was not paid by the hospital.

The manual also covered the hospital's clinical support services. This section included information on the hospital pharmacy, instructions on how to order a consultation from a cardiologist, and protocols for implementing patient telemetric monitoring. Another section of the manual, titled "Residency Program Information," provided details for eight distinct residency programs: anesthesiology, general practice dentistry, internal medicine, cardiovascular disease fellowship, obstetrics and gynecology, pathology, psychiatry, and surgery.

The chapter on the surgical residency program provided an overview of the program: "Since 1999 Danbury Hospital has been an integrated part of the surgical residency at Sound Shore Medical Center in New Rochelle, NY. The residency is affiliated with New York Medical College. Ten general surgical residents from Sound Shore Medical Center rotate at Danbury Hospital at any given time. Surgical residents have an opportunity to study under attending surgeons who have had their own training at multiple academic institutions."

This residency program section of the manual also established the hospital's expectations that residents must satisfy in order to be deemed proficient at six core competencies required by a national accreditation organization. The section goes on to describe the program's assessment procedures including surgical skills evaluation by faculty.[8] There was no evidence presented at trial that the faculty were employees or agents of the hospital.

The manual did not address the regulations and procedures governing a resident's participation in a surgical procedure. Dr. Gordon testified that it was within his discretion to determine the resident's level of involvement during a surgical procedure. He also testified that throughout a surgical procedure he maintained the authority to end the resident's participation: "[A]s the attending surgeon, I have to sometimes exert my authority and just take over, and I say, I'm taking over, and the resident steps aside."

After the plaintiffs rested their case, each defendant moved for a directed verdict. The trial court denied the motions. The jury returned a verdict in favor of the plaintiffs. The jury awarded the plaintiff $902,985.04 in economic damages and $9.6 million in noneconomic damages. Philip Gagliano was awarded $1.5 million in loss of consortium damages. The jury found that Dr.

Bodavula was an actual agent of the hospital.[9] Dr. Bodavula and the hospital were found liable for 80 percent of the plaintiffs' damages. The remaining 20 percent of liability was assigned to Dr. Gordon.

After the verdict, the hospital and Dr. Bodavula filed separate motions to set aside the verdict, for judgment notwithstanding the verdict, and remittitur. The court denied the six motions. With respect to the hospital's motions, the trial court found that there was sufficient evidence to support the jury's finding that Dr. Bodavula was an agent of the hospital when he operated on the plaintiff. Specifically, the court found that credible evidence was presented to the jury that showed that Dr. Bodavula: wore a hospital badge; treated patients according to the instructions of the chief resident; reported to and was evaluated by hospital staff; was required to follow hospital obligations, protocols and rules; and was assigned to the plaintiff's surgery by the chief resident. This appeal followed.

As the present case involves a motion to set aside the verdict made in conjunction with a motion for judgment notwithstanding the verdict, on the basis of the same grounds, we will treat the two motions as one for purposes of our resolution of the hospital's claim. *Macchietto* v. *Keggi*, 103 Conn. App. 769, 779, 930 A.2d 817, cert. denied, 284 Conn. 934, 935 A.2d 151 (2007). "Our review of the trial court's refusal to [grant the motions] requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, 242 Conn. 255, 277, 698 A.2d 838 (1997).

"The standard governing our review of a motion for judgment notwithstanding the verdict is the same as the standard applied to a court's decision to direct a verdict because a motion for judgment notwithstanding the verdict is not a new motion, but the renewal of a motion for a directed verdict. . . . Whether the evidence presented by the plaintiff was sufficient to withstand a motion for a directed verdict is a question of law, over which our review is plenary." (Citation omitted; internal quotation marks omitted.) *Millette* v. *Connecticut Post Ltd. Partnership*, 143 Conn. App. 62, 67–68, 70 A.3d 126 (2013). "The defendant must overcome a high threshold to prevail on either a motion for a directed verdict or a motion to set aside a judgment. . . . A directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Internal quotation marks omitted.) *Rawls* v. *Progressive Northern Ins. Co.*, 310 Conn. 768, 775, 83 A.3d 576 (2014).

Similarly, "[a] motion to set aside the verdict should be granted if the jury reasonably and legally could not have reached the determination that they did in fact reach. . . . [Put differently], [i]f the jury, without conjecture, could not have found a required element of the cause of action, it cannot withstand a motion to set aside the verdict. . . . Thus, the role of the trial court on a motion to set aside the jury's verdict is not to sit as [an added] juror, but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did. . . . As a corollary, it is the court's duty to set aside the verdict when it finds that it does manifest injustice, and is . . . palpably against the evidence." (Citations omitted; internal quotation marks omitted.) *Marciano* v. *Kraner*, 126 Conn. App. 171, 177, 10 A.3d 572, cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011).

We turn now to the doctrine of vicarious liability under which the jury concluded that the hospital was liable. "[V]icarious liability is premised upon the general common law notion that one who is in a position to exercise some general control over the situation must exercise it or bear the loss. . . . Put differently, a fundamental premise underlying the theory of vicarious liability is that an employer exerts control, fictional or not, over an employee acting within the scope of employment, and therefore may be held responsible for the wrongs of that employee." (Citation omitted; internal quotation marks omitted.) *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 693 n.16, 849 A.2d 813 (2004). "Before vicarious liability can be imposed, however, there must be sufficient evidence produced to warrant a finding of agency between the parties. If there is a finding that the allegedly negligent actor is not an employee or agent, then the claim of vicarious liability must fail." *Cefaratti* v. *Aranow*, 154 Conn. App. 1, 29, 105 A.3d 265 (2014), rev'd on other grounds, 321 Conn. 593,      A.3d      (2016).[10]

"Agency is defined as the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. . . . Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." (Citation omitted; internal quotation marks omitted.) *Bellsite Development, LLC* v. *Monroe*, 155 Conn. App. 131, 142, 122 A.3d 640, cert. denied, 318 Conn. 901, 122 A.3d 1279 (2015).

"Some of the factors listed by the Second Restatement of Agency in assessing whether such a relationship exists include: whether the alleged princi-

pal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the instrumentalities, tools, and the place of work . . . and the method of paying the agent. . . . In addition, [a]n essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal. . . . Finally, the labels used by the parties in referring to their relationship are not determinative; rather, a court must look to the operative terms of their agreement or understanding." (Citations omitted; internal quotation marks omitted.) *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 120, 133–34, 464 A.2d 6 (1983). "The burden of proving agency is on the party asserting its existence." *New England Whalers Hockey Club* v. *Nair*, 1 Conn. App. 680, 683, 474 A.2d 810 (1984).

We conclude, as a matter of law, that the trial court erred by denying the hospital's motions to set aside the verdict and render judgment notwithstanding the verdict in the hospital's favor. The plaintiffs produced insufficient evidence from which the jury reasonably could have found that Dr. Bodavula was the hospital's agent for purposes of assisting in the plaintiff's surgery and, therefore, the hospital should not have been held vicariously liable for the plaintiff's injuries. Viewing the evidence in the light most favorable to the plaintiffs, the evidence presented was so lacking that it could not establish that there was an understanding between Dr. Bodavula and the hospital that the hospital would be in control of Dr. Bodavula's performance of the surgery. The plaintiffs suggest that the evidence demonstrated that the hospital controlled many aspects of a resident's work at the hospital and, therefore, the hospital must have also been in control of a resident's performance of surgical procedures, regardless of whether an attending physician was present and had overall responsibility for the patient. It is plausible that some of the evidence, viewed out of context, could have suggested an agency relationship, but when the evidence is viewed in context and focused on the plaintiff's surgery alone, it was the court's duty to set aside the verdict because it was palpably against the evidence presented.

Medical residency programs are unique in that they have both academic and employment characteristics. See *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 586–87, 687 A.2d 111 (1996). The evidence in this case suggested that the nature of the medical resident's relationship to the hospital was controlled by a residency agreement, but that agreement was not introduced into evidence. In fact, the plaintiffs did not produce any direct evidence to support their position that the hospital was in control of the surgical procedure. Instead, the plaintiffs relied extensively on circumstantial evidence, including the content of the hospital's manual. The manual was entered into evidence without the necessary context to determine

whether it contemplated an academic relationship or an employment relationship, or both. It was most notably not established that the provisions of the manual were intended to regulate surgical procedures. Furthermore, other circumstantial evidence produced by the plaintiffs, e.g., security badges, could not lead to a reasonable inference of agency by the jury.

The relationship between a resident and a hospital is unique. See id., 586. As our Supreme Court noted in *Gupta*, these types of relationships may be of a hybrid nature, with both academic and employment features. Id. By definition, agency is an agreement between parties that authorizes the principal to control certain aspects of the agent's conduct. See *Bellsite Development, LLC* v. *Monroe*, supra, 155 Conn. App. 142. During the trial, the plaintiffs referred to the residency agreement,[11] and the manual that had been entered into evidence referred to the residency agreement,[12] but the residency agreement itself was not entered into evidence.

At a minimum, to determine any agency relationship, let alone one involving a medical resident, "a court must look to the operative terms of their agreement or understanding." (Internal quotation marks omitted.) *Beckenstein* v. *Potter & Carrier, Inc.*, supra, 191 Conn. 133–34. In the context of a medical residency program, the residency agreement is a critical tool to aid the finder of fact in determining whether an agency relationship existed. In *Gupta*, Chief Justice Peters looked to the residency agreement to determine a medical resident's employment status for purposes of his claim that he was an employee under contract with New Britain General Hospital and that he had been wrongly dismissed. *Gupta* v. *New Britain General Hospital*, supra, 239 Conn. 582. After interpreting the agreement, Chief Justice Peters concluded that the resident's relationship to the hospital and the hospital's decision to dismiss him was an academic decision. Id., 584–85.

In *Gupta*, the nature of the medical resident's relationship to the hospital, as it related to the claim in question, was integral to the resolution of the case. Determining whether the plaintiff resident in that case was acting as an employee or a student was an exercise similar to the resolution of whether the resident was an agent of the hospital for purposes of assisting in the plaintiff's surgery.[13] An assessment of a resident's employment status "is purely a question of law" and "must take into account the language of the residency agreement as well as any circumstances that might illuminate our interpretation of this language."[14] Id., 582. "In the absence of any question of fact, the proper characterization of the residency agreement, as a matter of law, implicates a number of factors, including the language of the agreement, the purpose of the parties in entering into the agreement, and the institutional

setting of the agreement." Id., 583. Without the residency agreement, this foundational analysis could not be performed in this case.

The glaring absence of the residency agreement was all the more relevant because the surgical residency program was managed and shared among several organizations and parties.[15] As the manual stated, this was an integrated residency program involving three separate organizations: the hospital, Sound Shore Medical Center, and New York Medical College.[16] In addition, faculty physicians with hospital privileges supervised residents during surgical procedures and evaluated their performance.[17] Critical factual evidence regarding the complex relationships involved in this surgical residency program was not presented at trial. The plaintiffs were not under any requirement to enter the residency agreement into evidence. However, without the residency agreement, the jury was left with an incomplete picture of the residency program and the precise nature of the hospital's relationship with its residents, including Dr. Bodavula, in order to allow for a finding of agency.

The plaintiffs did not present any evidence that specifically showed that Dr. Bodavula had agreed to act or was authorized to act as an agent of the hospital during the plaintiff's surgery. The critical question was whether the hospital had a right to control Dr. Bodavula's performance of the surgery. See *Cefaratti* v. *Aranow*, supra, 154 Conn. App. 34. There was not sufficient evidence to satisfy the burden of proof of agency.[18] The evidence suggested that only Dr. Gordon was "in control" of Dr. Bodavula during the course of the plaintiff's surgery. The hospital did not dictate how Dr. Gordon was to utilize the assistance of the resident, and there was no evidence of standard procedures that regulated the conduct of Dr. Gordon and Dr. Bodavula in relation to the surgery.[19]

At all times, the only conclusion rationally drawn from the evidence was that Dr. Gordon was in command of the plaintiff's surgery.[20] Dr. Gordon testified: "[T]his is a resident in training and I'm his instructor, I'm watching his moves very carefully, and I'm standing, literally, right behind him, over his shoulder . . . ." The plaintiffs did not produce any evidence to contradict Dr. Gordon's testimony that he, and not the hospital, was in control of Dr. Bodavula's performance of the surgical tasks in the operating room.[21] It was the plaintiffs' burden to prove agency. See *New England Whalers Hockey Club* v. *Nair*, supra, 1 Conn. App. 683.

Instead, the plaintiffs attempted to prove that an agency relationship existed by presenting circumstantial evidence, including the hospital's house staff manual.[22] We conclude that this reliance was misplaced for purposes of determining agency.[23] The manual was insufficient to permit a finding that an agency relation-

ship existed between the hospital and Dr. Bodavula regarding the plaintiff's surgery. A close and careful reading of the manual reveals no contractual language or agreement between the parties creating an agency relationship for purposes of assisting in surgical procedures. Rather, the manual was controlled by the residency agreement and in fact referred to the residency agreement for specific details. As the benefits section of the manual stated: "Danbury Hospital will provide a salary to the Resident, *as specified in the Danbury Hospital Resident Agreement.*" (Emphasis added.)

In the context of the residency program, the manual was insufficient to support the existence of an agency relationship in the conduct of surgery. In *Gupta*, Chief Justice Peters employed a functional analysis: "Because of the hybrid nature of the residency agreement, we conclude that the agreement is more properly interpreted, under any particular set of circumstances, by a functional analysis of its terms in relationship to the nature of the alleged breach, rather than by an overarching search for the purpose or purposes of the parties." *Gupta* v. *New Britain General Hospital*, supra, 239 Conn. 586. Chief Justice Peters noted: "Arthur Corbin commented perceptively on the utility of a judicial search for the principal purpose of a contract when he wrote: 'How is a court to discover what was the principal purpose of the parties or whether they had any? It is certain, in practically all business transactions, that they had different purposes, at least in part. Their principal purpose, or their separate and diverse purposes, can not be determined by a process that is wholly independent of the words of the agreement.' " Id., 586 n.11.

In this case, the jury was left to determine the principal purpose of the parties' relationship solely through the 231 page manual, without "the language of the residency agreement"; id., 582; and without context. The manual did not describe the relationship between academics and work, or explain where the line between the two diverse roles was drawn.[24] As a result, the jury was not in a position to consider whether the hospital had the right to control Dr. Bodavula's performance of the surgery because, as the court in *Gupta* noted, if this was an academic relationship then the right to control test was not appropriate. "We have used the right to control test to distinguish between an independent contractor and an employee. . . . That test has no relevance, however, to the criteria for differentiation between a student and an employee. Indeed, it is a premise of the right to control test that what is at issue is the control of the means and methods of work . . . thus assuming the very point that is presently at issue." (Citations omitted; internal quotation marks omitted.) Id., 588. There is an inherent level of control in the academic setting, but it is a different nature and degree of control than is present in the employer-employee relationship.[25] For example, in the academic setting the

term "evaluate" generally means that a person will be graded on their work,[26] but in the employment setting it can refer to a method used to control a person's work. The plaintiffs highlighted for the jury's consideration a section of the manual that referenced "surgical skills evaluations," but without necessary context there was no way for the jury to determine whether this evaluation was an academic or employment exercise and, thus, whether it created an agency relationship between the resident and the hospital.

The scope and applicability of the manual limited its effectiveness for a finding of agency. The scope of the manual focused on protocols, not control of resident performance and execution of surgical procedures. The trial court, in its ruling, cited to the manual as requiring Dr. Bodavula to comply with the hospital's "obligations, protocols, and rules," but the section of the manual that was referenced applied generally to all of the residency programs at the hospital. The chapter on the surgical residency program provided more tailored guidance. The introduction stated: "Surgical residents have an opportunity to *study under attending surgeons* who have had their own training at multiple academic institutions." (Emphasis added.) The duties and responsibilities listed in the surgery chapter of the manual pertained to seeing and evaluating general surgery in-patients outside of the operating room. These inpatient surgical resident duties included conducting morning rounds, ordering laboratory testing, and updating progress notes. The duties did not include participating in surgical procedures. In fact, satisfactory completion of the listed duties was a prerequisite to observing and participating in surgical procedures.[27] Surgical residents would be evaluated on their manual dexterity in the operating room and their overall surgical skills, but these evaluations appeared to be a part of the resident's academic ascension.[28]

There were also general issues of applicability pertaining to the manual that, again, limited its effectiveness for a finding of agency. It was unclear which provisions of the manual applied to surgical residents.[29] Eight diverse residency programs were discussed in the manual. Some of the residency programs were organic to the hospital, yet others, including the surgery program, were shared across other organizations.[30]

In its memorandum of decision, the court concluded that "[the hospital's] manual belies its contentions that it had no ability to control, assign and/or structure the work that Dr. Bodavula would do in its organization." As support, the trial court cited to the manual to conclude that Dr. Bodavula received from the hospital: a salary, rent-free housing, vacation time, sick time, and professional liability insurance. However, Dr. Bodavula testified that the hospital did not pay him,[31] and no evidence was presented to show that Dr. Bodavula was

provided housing,[32] or to show that he received any employment benefits.[33] There is no question that the hospital exercised some level of control over some of Dr. Bodavula's activities that were conducted at the hospital. However, the circumstances of this case raise a more specific question: whether the hospital was "in control" of Dr. Bodavula's performance of the plaintiff's surgery. The plaintiffs presented insufficient evidence to properly allow for the question to be affirmatively answered.

The remaining circumstantial evidence that was presented was not sufficient to support a finding of agency. The plaintiffs produced evidence to show that Dr. Bodavula was directed to the plaintiff's surgery by the chief resident of the surgical residency program, but the plaintiffs did not present any evidence to show that the chief resident was an agent of the hospital for the purpose of the conduct of surgery. In the memorandum of decision, the trial court cited to evidence that Dr. Bodavula was assigned to the plaintiff's surgery by the chief resident and saw patients according to the chief resident's instructions. According to the hospital's manual, the chief resident had authority to set the "precise structure of the rotation . . . ." However, testimony from Dr. Bodavula and Dr. Gordon indicated that the chief resident's relationship to the hospital was similar in nature to Dr. Bodavula's relationship.[34] Given the uncertainty of the chief resident's relationship to the hospital, he or she could not serve as the link to a finding that there was express authority for Dr. Bodavula to act as the hospital's agent during the plaintiff's surgery.

Finally, the trial court cited as support for its judgment that Dr. Bodavula wore a Danbury Hospital badge, but this evidence does not aid the analysis for determining agency. Hospitals regularly control access for security purposes. A grant of access to the hospital has no bearing on how surgery is performed. Dr. Bodavula's hospital badge does not prove that there was an understanding between him and the hospital that the hospital had the right to control Dr. Bodavula during the plaintiff's surgery.

The plaintiffs failed to produce sufficient evidence from which the jury reasonably could have concluded that Dr. Bodavula was an agent of the hospital for purposes of assisting in the plaintiff's surgery. As such, the hospital should not have been held vicariously liable. Viewing the evidence in the light most favorable to the plaintiffs, we conclude that the evidence was "so weak that it would be proper for the court to set aside [the] verdict rendered" in favor of the plaintiffs. (Internal quotation marks omitted.) *Rawls* v. *Progressive Northern Ins. Co.*, supra, 310 Conn. 775. The trial court's ruling, denying the hospital's motion to set aside the verdict or to render judgment notwithstanding the verdict, relied almost exclusively on the hospital's manual.

The manual, which Dr. Bodavula claimed he could not recall receiving, did not serve as a contract between him and the hospital, did not appear to be fully applicable to the surgical residency program, and did not address control over a resident during a surgical procedure. The trial court erred by not granting the hospital's motions to set aside the verdict and for judgment notwithstanding the verdict.

The judgment is reversed only as to the defendant hospital and the case is remanded with direction to render judgment for the hospital. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Throughout this opinion, when we refer to the plaintiff in the singular form we are referring to Vivian Gagliano.

[2] Prior to the commencement of the trial, the Gaglianos settled their claims with and withdrew the complaint against Dr. Joseph R. Gordon, the attending physician responsible for the plaintiff's surgery, and his practice, Advanced Specialty Care, P.C. Dr. Bodavula did not appeal from the trial court's judgment.

[3] Because we have concluded that there was insufficient evidence to establish agency between the hospital and the medical resident, we decline to review the hospital's claim that, as a matter of law, it could not be held vicariously liable because a state statute precludes it from practicing medicine or controlling the medical decisions of licensed medical professionals.

[4] Dr. Gordon had two offices and neither was located at the hospital.

[5] "A residency training program provides medical school graduates with the clinical training necessary for board certification in specialty or subspecialty areas. . . . A residency is, in many respects, part of an educational continuum begun in medical school. . . . [R]esidents are physicians in transition . . . . The ultimate objective of the residency program is to educate the physician in the healing arts. Rather than relying on book study alone, a residency program achieves this result by involving the physician in day-to-day patient care and specialized clinical activities." (Citations omitted; internal quotation marks omitted.) *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 587, 687 A.2d 111 (1996).

[6] On May 29, 2013, Sound Shore Medical Center filed for bankruptcy. The Bankruptcy Court approved a stipulation limiting Sound Shore Medical Center's financial liability, for Dr. Bodavula's alleged negligence, to the amount of any available insurance coverage. The plaintiffs' counsel addressed the stipulation with the trial court in this case: "There's one collateral issue that we've bundled into this, which is that, as the court is aware, plaintiffs signed a stipulation, with Dr. Bodavula, in order to proceed against him, outside of the—or with the permission of the bankruptcy court. [Danbury Hospital is] not a beneficiary to that agreement, it doesn't affect the hospital's liability in any way, and we just needed to confirm that with the hospital, on the record, such that, in the event there's a verdict against the hospital and it is in excess of—Dr. Bodavula's million dollar policy, the hospital's responsible for, basically, dollar one, after a million, assuming that, obviously, the jury finds agency, but that those two liabilities are separate."

[7] The following colloquy occurred between the plaintiffs' counsel and Dr. Bodavula:

"[The Plaintiffs' Counsel]: Okay. And, they gave you a manual, correct?

"[Dr. Bodavula]: I don't—I don't remember.

"[The Plaintiffs' Counsel]: Well, it was a while ago, but let me show you, do you recall that, in your residency, you would be provided manuals, in this case, from the Danbury Hospital? . . .

"[Dr. Bodavula]: I don't—they must have given, during the orientation, but I don't remember, specifically, and I did—I don't know whether I kept it or—

"[The Plaintiffs' Counsel]: Okay. So, if there was a house staff manual, it's—you understand that you would be expected to live up to the obligations in that manual, correct?

"[Dr. Bodavula]: Yes."

[8] The following colloquy occurred between the plaintiffs' counsel and Dr. Gordon:

"[The Plaintiffs' Counsel]: And, when the house staff manual refers to faculty, it's referring to the teaching faculty at the hospital, right?

"[Dr. Gordon]: Yes.

"[The Plaintiffs' Counsel]: And that would have included you in 2008 for the surgical residency program, correct?

"[Dr. Gordon]: I believe so."

[9] The interrogatories provided to the jury first asked if Dr. Bodavula was negligent in his performance while assisting with the plaintiff's surgery. Because the jury answered yes, the jury was required to determine whether the hospital would be held liable. The form stated: "Do you find that Dr. Bodavula was an actual agent of Danbury Hospital as of July 23, 2008? . . . If yes . . . you have reached a verdict against Danbury Hospital in favor of Vivian and Phil Gagliano." The jury marked the line indicating yes.

Once there has been a finding of agency, vicarious liability attaches to the principal. See *Cefaratti* v. *Aranow*, 154 Conn. App. 1, 29, 105 A.3d 265 (2014), rev'd on other grounds, 321 Conn. 593, A.3d (2016). On the basis of the jury's finding of agency, the hospital was vicariously liable for the plaintiff's injuries that were caused by Dr. Bodavula's negligence.

[10] In *Cefaratti* v. *Aranow*, 321 Conn. 593, 609, A.3d (2016), our Supreme Court recently held that "both the doctrine of apparent authority and the doctrine of apparent agency may be applied in tort actions." The Supreme Court specifically stated: "[W]e adopt the following alternative standards for establishing apparent agency in tort cases. First, the plaintiff may establish apparent agency by proving that: (1) the principal held itself out as providing certain services; (2) the plaintiff selected the principal on the basis of its representations; and (3) the plaintiff relied on the principal to select the specific person who performed the services that resulted in the harm complained of by the plaintiff. Second, the plaintiff may establish apparent agency in a tort action by proving the traditional elements of the doctrine of apparent agency, as set forth in our cases involving contract claims, plus detrimental reliance." Id., 624.

Although the plaintiffs' operative complaint in the present case included an allegation that Dr. Bodavula was an "apparent agent" of the hospital, the interrogatories completed by the jury indicate that it expressly found that he was an actual agent of the hospital. The plaintiffs have not filed a cross appeal or otherwise raised any claim regarding the propriety of that determination. The issue of apparent agency, therefore, is not at issue in this appeal.

[11] While discussing jury instructions, the plaintiffs' counsel stated: "The first element, just on the Judicial [Branch] website in terms of stock jury instructions, is that there must have been an agreement that the agent would act for, on behalf of, the principal, and, in this case, in the provision of [the] residency agreement."

[12] The manual referred to the residency agreement under the personnel policies and procedures section: "Personnel policies not covered in the Resident Agreement, the House Staff Manual or residency-specific handbook will conform to those established by the Danbury Hospital's Personnel Policy and Practice Manual."

[13] Generally, an employee is considered to be an agent for his or her employer. See *Young* v. *Bridgeport*, 135 Conn. App. 699, 708, 42 A.3d 514 (2012) ("The fundamental distinction between an employee and an independent contractor depends upon the existence or nonexistence of the right to control the means and methods of work. . . . It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent." [Internal quotation marks omitted.]). Our courts have not addressed whether a student acting within the scope of that particular academic relationship may be an agent for a school. But see *Doe* v. *Yale University*, 252 Conn. 641, 683–84, 748 A.2d 834 (2000) ("Depending on the evidence adduced, a medical resident who is to be educated and trained also may be an employee for purposes of the [Workers' Compensation] [A]ct. [General Statutes § 31-275 et seq.].").

[14] The plaintiffs claim that Dr. Bodavula's relationship with the hospital was "in the nature of an employment relationship."

[15] As an example, Dr. Gordon testified that he conducted evaluations of surgical residents. These completed evaluations were shared not only with the hospital faculty, but also with the Sound Shore Medical Center residency program director:

"[The Hospital's Counsel]: And [the Sound Shore Medical Center residency program director would] come to Danbury Hospital?

"[Dr. Gordon]: On occasion.

"[The Hospital's Counsel]: And you'd have meetings with the surgeons?

"[Dr. Gordon]: Yes.

"[The Hospital's Counsel]: And you would be asked to give your verbal assessment of residents?

"[Dr. Gordon]: Yes.

"[The Hospital's Counsel]: To the head of the program out of Sound Shore Medical Center?

"[Dr. Gordon]: Yes."

[16] The following colloquy occurred between the plaintiffs' counsel and Dr. Gordon:

"[The Plaintiffs' Counsel]: Who, in your understanding, had authority for the responsibility and oversight of the administration of the hospital's residency program? . . .

"[Dr. Gordon]: . . . It depends on the residency program—I think, it's different for different departments, so if you're speaking, specifically, toward surgery, the authority is split, as I understood it, between Sound Shore Medical Center and Danbury Hospital."

[17] The following colloquy occurred between the plaintiffs' counsel and Dr. Gordon:

"[The Plaintiffs' Counsel]: Okay. Do you remember how you provided it, evaluation of the residents' performance in 2008?

"[Dr. Gordon]: There were occasional evaluation meetings, where I would attend and offer input, and we also, as—as stated here, provide appropriate verbal feedback to the specific residents."

[18] "An employer may exercise control over the general results and also the immediate results from time to time, without creating an agency relationship." *Cefaratti* v. *Aranow*, supra, 154 Conn. App. 30 n.20.

[19] The following colloquy occurred between the hospital's counsel and Dr. Gordon:

"[The Hospital's Counsel]: . . . [T]he hospital doesn't give you a list of questions that you must ask the resident before you make a decision to allow him to use an instrument, correct?

"[Dr. Gordon]: Yes."

Relative to guidelines as to how residents were to perform surgical procedures and as to progressive responsibilities for residents, the following colloquy occurred:

"[The Hospital's Counsel]: . . . Is there anything that you have seen today, anything that's been shown to you by [the plaintiffs' counsel] that indicates in any detail or shows any factors as to how [residents] would correctly perform surgical procedures—how [residents] would go about achieving this goal?

"[Dr. Gordon]: No.

"[The Hospital's Counsel]: Okay. And with respect to this progressive responsibilities that we've seen in—in this trial, and it's no doubt an important aspect of the goal of training residents so they can become doctors—full-fledged doctors, is that correct?

"[Dr. Gordon]: Yes.

"[The Hospital's Counsel]: Fully licensed in—in training doctors?

"[Dr. Gordon]: Yes.

"[The Hospital's Counsel]: Okay. But the decisions—the—that are made as to what are appropriate progressive responsibilities are made by individual physicians based on their discussions with the resident, their assessment of their skills, and their experience, correct?

"[Dr. Gordon]: Yes.

"[The Hospital's Counsel]: And there are no specific guidelines that you've seen published by Danbury Hospital that you can go to that tells you how to go about making that assessment?

"[Dr. Gordon]: That's right."

[20] On the basis of the evidence presented at trial, Dr. Gordon was not an agent of the hospital. See *Cefaratti* v. *Aranow*, supra, 154 Conn. App. 30 ("the fact that a physician holds staff privileges at a hospital is not itself sufficient to support a finding that an agency relationship was created").

[21] During Dr. Gordon's testimony, counsel for the hospital asked: "No on[e] employed at Danbury Hospital or no representative of Danbury Hospital, instructed you to let or have Dr. Bodavula use the bladeless optical trocar on [the plaintiff], on July 23rd, 2008, correct?" Dr. Gordon replied: "Correct."

[22] The plaintiffs' expert witness testified about his understanding of the manual:

"[The Hospital's Counsel]: Okay. And, they're basically, as I understand it, based on the cover letter, [the manual is] for the residents, correct, to give them an introduction into what's to be expected of them and—and also, you know, just even simple things, like, how to find their way around

the hospital and record keeping, et cetera?

"[The Plaintiffs' Expert Witness]: Yes, sir, they deal with record keeping and they deal with where to get uniforms, they deal with both the practical things of everyday life as a resident, as well as the policies that the residents are supposed to follow."

[23] We note that circumstantial evidence itself can be sufficient: "It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned." (Internal quotation marks omitted.) *State* v. *Stephens*, 111 Conn. App. 473, 479, 959 A.2d 1049 (2008), cert. denied, 290 Conn. 910, 964 A.2d 547 (2009).

[24] We make no assumptions as to whether the residency agreement would or would not support a finding of an agency relationship between the hospital as a residency site and the surgical resident.

[25] "*Gupta* involved the dismissal of a medical resident for poor performance. This court used a 'functional analysis' of the residency agreement to determine that its purpose was educational. In other words, the purpose of a residency and the residency agreement is to educate a medical student, albeit in the context of a job at a hospital. Dismissal for poor performance was therefore an educational decision, akin to giving a poor grade to a student in class. This academic decision deserves deference from the courts." *Craine* v. *Trinity College*, 259 Conn. 625, 663, 791 A.2d 518 (2002).

[26] "Evaluation of [a medical student's] performance in the [clinical] area is no less an academic judgment because it involves observation of her skills and techniques in actual conditions of practice, rather than assigning a grade to her written answers on an essay question." (Internal quotation marks omitted.) *Board of Curators of University of Missouri* v. *Horowitz*, 435 U.S. 78, 95, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978) (Powell, J., concurring).

[27] The manual stated: "Participation in the [operating room] is contingent upon complete care of the patients on the nursing floors."

[28] The surgical residency chapter of the house manual listed "practice-based learning and improvement" as a core competency to be completed during the course of the program. Achievement of this competency would include assessment of a resident's manual dexterity, "evaluated in the operating room and on the surgical floors by Attending Surgeons and Chief Residents as reflected by operative technique, performance of basic bedside procedures and quality of assistance during complex operative procedures."

[29] Commenting on the imprecision of the manual, the plaintiffs' counsel stated during closing argument: "[The surgical residents] even had to listen to the dental staff, evidently."

[30] The programs were wideranging: the anesthesiology residency was integrated with Westchester County Medical Center; the psychiatry residency program was part of the New York Medical College Department of Psychiatry residency consortium; as it pertains to this case, the surgical residency was integrated with Sound Shore Medical Center and New York Medical College; and the other residency programs were dedicated to only Danbury Hospital.

[31] The plaintiffs did not challenge Dr. Bodavula's testimony regarding the source of his pay, nor did they present any evidence to contradict that testimony. The section of the manual that pertained to compensation referred to the residency agreement for specifics about a resident's salary.

[32] The manual states: "The Resident is provided rent-free housing, as available, by means of an annual lottery. The rental is established by separate agreement with the Facilities Department. The Hospital will provide a subsidy for off-campus housing secured independently by the Resident." During his testimony, Dr. Bodavula was not asked whether he was receiving rent-free housing. Also, neither party presented a housing agreement between Dr. Bodavula and the hospital facilities department.

[33] Dr. Bodavula testified that only 50 percent of his residency work occurred at Danbury Hospital. The sponsoring hospital, Sound Shore Medical Center in New Rochelle, New York, was the alternate site of his training.

[34] Dr. Bodavula's testimony suggested that he and the chief resident had a similar employment status:

"[The Plaintiffs' Counsel]: . . . [Y]ou were assigned to [the plaintiff's] surgery by somebody from the hospital, true?

"[Dr. Bodavula]: He's part of my res—I mean, the whole program. . . . The chief resident.

"[The Plaintiffs' Counsel]: Right.

"[Dr. Bodavula]: The fifth year resident or the chief resident.

"[The Plaintiffs' Counsel]: Okay. He was at Danbury Hospital and he assigned you this surgery, true?

"[Dr. Bodavula]: Yes. . . .

"[The Plaintiffs' Counsel]: . . . [Y]ou did . . . what the Danbury Hospi-

tal resident told you, true?

"[Dr. Bodavula]: He's—when you use the word Danbury Hospital resident, what do you mean? . . .

"[The Plaintiffs' Counsel]: The chief resident who was working at Danbury Hospital?

"[Dr. Bodavula]: Okay. So, I'm also the same residence, as the same part of the same pool of residents."

Dr. Gordon's testimony also indicated that the hospital did not directly oversee surgical resident assignments:

"[The Plaintiffs' Counsel]: . . . [I]t was determined by somebody at the hospital, as to whether or not there would be an assistant resident surgeon there, is that correct?

"[Dr. Gordon]: It's—yes, it's determined by the resident staff themselves."

---