McDONALD, J.
**748 The primary issue in this medical malpractice action is whether there was sufficient evidence from which the jury reasonably could have found that the defendant surgical resident, Venkata Bodavula, was an actual agent of the defendant hospital, Danbury Hospital, when he negligently performed a surgical procedure under the supervision of a member of the hospital's clinical faculty who was also the plaintiff's private physician. Upon our grant of certification, Vivian Gagliano (plaintiff) and her husband, Philip Gagliano (collectively, plaintiffs), appeal from the judgment of the Appellate Court reversing the trial court's judgment, in part, as to the hospital's vicarious liability for Bodavula's negligence. We conclude that the trial court properly determined that there was sufficient evidence to establish such an agency relationship, and that imposing vicarious liability on the hospital for Bodavula's actions was not improper.
The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found, which we supplement in part I of this opinion, and procedural history. "On July 23, 2008, the plaintiff underwent hernia repair surgery at the hospital. The **749 surgery was to be performed by [Joseph R. Gordon], her physician, who had recommended the procedure to the plaintiff during an examination at his office. [Gordon] was not employed by the hospital, but maintained staff privileges allowing him to attend to his patients admitted to the hospital.
"Prior to the start of the procedure, but without the plaintiff's [specific] knowledge, a fourth year [surgical] resident, [Bodavula], was assigned to assist [Gordon] with the surgery.[1] ... [Gordon] asked [Bodavula] about his experience with a surgical *590 device called an optical trocar, which was to be used in the surgery. [Bodavula] informed [Gordon] that he knew how to use the device. Under [Gordon's] supervision, [Bodavula] performed the initial insertion of the device into the plaintiff's abdomen.
"As the surgery proceeded, [Gordon] became concerned that [Bodavula] was improperly [applying too much force in] using the optical trocar. At that point, [Gordon] took over for [Bodavula] and completed the plaintiff's surgery. Two days after the surgery, while recovering in the hospital, the plaintiff began to exhibit signs of infection, and her body went into septic shock. It was discovered that the plaintiff's colon had been perforated during the surgery. [As a consequence, the plaintiff ultimately sustained life threatening and life altering injuries.] ...
"The [plaintiff and her husband, respectively] filed negligence [and loss of consortium] claims against [Gordon], his practice, Advanced Specialty Care, P.C., [Bodavula], and the hospital. The plaintiffs alleged that [Gordon] and [Bodavula] were [actual or apparent] agents of the hospital, and, therefore, the hospital was **750 vicariously liable for their actions. Prior to the commencement of trial, the plaintiffs settled with [Gordon] and Advanced Specialty Care, P.C., for an undisclosed sum. In May, 2014, a jury trial commenced to address the remaining claims against [Bodavula] and the hospital.
"[At trial, evidence was adduced establishing that Bodavula] was enrolled in the surgical residency program at Sound Shore Medical Center in New Rochelle, New York. The program included rotations at Danbury Hospital. [Bodavula] testified that as a fourth year medical resident he spent approximately 50 percent of his time at the hospital. A rotation at the hospital would last one to two months. On the day of the plaintiff's surgery, the chief resident of the surgical residency program assigned [Bodavula] to assist [Gordon]. There was no evidence presented as to whether the chief resident was an employee of the hospital, but [Bodavula] testified that in regard to the chief resident, 'I'm also the same residence, as the same part of the same pool of residents.'
"During his testimony, [Bodavula] was questioned about the hospital's House Staff Manual (manual). [Bodavula] testified that he could not recall whether he had received a copy of the manual. Despite not being able to recall if he had received the manual, he believed that he was expected to comply with the obligations that it established.
"Later in the trial, the hospital stipulated that the manual had been distributed to residents in 2008. The entire 231 page manual was admitted into evidence as a full exhibit. The trial court ruled that the manual was relevant to the question of whether [Bodavula] was an agent of the hospital....
"The first section of the manual addressed resident policies, including selection to the program, resident evaluations, responsibilities, hospital safety, and **751 benefits. The section on benefits included details about [the hospital's provision of] rent-free housing [or a housing stipend], vacation and sick leave, as well as [professional liability, health, disability, and life] insurance. It also stated: 'Danbury Hospital will provide a salary to the [r]esident, as specified in the Danbury Hospital Resident Agreement.' There was no evidence submitted as to a 'Residency Agreement' between [Bodavula] and the hospital. He testified that he was not paid by the hospital....
"Another section of the manual, titled 'Residency Program Information,' provided *591 details for eight distinct residency programs ... [including] surgery.
"The chapter on the surgical residency program provided an overview of the program: 'Since 1999 Danbury Hospital has been an integrated part of the surgical residency at Sound Shore Medical Center in New Rochelle, [New York]. The residency is affiliated with New York Medical College. Ten general surgical residents from Sound Shore Medical Center rotate at Danbury Hospital at any given time. Surgical residents have an opportunity to study under attending surgeons who have had their own training at multiple academic institutions.'
"This residency program section of the manual also established the hospital's expectations that residents must satisfy in order to be deemed proficient at six core competencies required by a national accreditation organization. The section goes on to describe the program's assessment procedures including surgical skills evaluation by faculty....
"[Gordon] testified that it was within his discretion to determine the resident's level of involvement during a surgical procedure. He also testified that throughout a surgical procedure he maintained the authority to end the resident's participation: '[A]s the attending surgeon, **752 I have to sometimes exert my authority and just take over, and I say, I'm taking over, and the resident steps aside.'
"After the plaintiffs rested their case, each defendant moved for a directed verdict. The trial court denied the motions. The jury returned a verdict in favor of the plaintiffs. The jury awarded the plaintiff $902,985.04 in economic damages and $9.6 million in noneconomic damages. Philip Gagliano was awarded $1.5 million in loss of consortium damages. [In its responses to interrogatories, the] jury found that [Bodavula] was an actual agent of the hospital.[2] [Bodavula] and the hospital were found liable for 80 percent of the plaintiffs' damages. The remaining 20 percent of liability was assigned to [Gordon].
"After the verdict, the hospital and [Bodavula] filed separate motions to set aside the verdict, for judgment notwithstanding the verdict, and remittitur. The court denied the six motions. With respect to the hospital's motions, the trial court found that there was sufficient evidence to support the jury's finding that [Bodavula] was an agent of the hospital when he operated on the plaintiff. Specifically, the court found that credible evidence was presented to the jury that showed that [Bodavula] wore a hospital badge; treated patients according to the instructions of the chief resident; reported to and was evaluated by hospital staff; was required to follow hospital obligations, protocols and set rules; and was assigned to the plaintiff's surgery by the chief resident. [The court also substantially relied on the manual as evidence of the hospital's right to control Bodavula.]"
**753 (Footnotes added and omitted.) Gagliano v. Advanced Specialty Care, P.C. , 167 Conn. App. 826, 828-35, 145 A.3d 331 (2016).
The record reveals the following additional procedural history. The trial court rendered judgment in accordance with the verdict, from which the hospital appealed. In its appeal to the Appellate Court, the *592 hospital claimed that (1) there was insufficient evidence that Bodavula acted as the hospital's agent when performing the surgery, and (2) a conclusion that the hospital had the right to control Bodavula's surgical performance would contravene the public policy expressed in statutes generally barring the corporate practice of medicine. Id., at 828-29, 145 A.3d 331 and n.3. The Appellate Court agreed with the first ground and, therefore, did not reach the second. Id., at 829, 145 A.3d 331 n.3. Specifically, the Appellate Court held that the evidence did not establish that there was an understanding between Bodavula and the hospital that the hospital would be in control of Bodavula's performance of the surgery. Id., at 838, 145 A.3d 331. The court pointed to the plaintiffs' failure to introduce the residency agreement as a "glaring" evidentiary omission; id., at 841, 145 A.3d 331 ; and reasoned that the manual and the remaining evidence were insufficient to fill that void. Id., at 844, 145 A.3d 331. Largely in reliance on Gupta v. New Britain General Hospital , 239 Conn. 574, 687 A.2d 111 (1996), the Appellate Court reasoned that because of the dual functions of residency programs-employment and academic training-the jury lacked any basis to determine whether Bodavula was acting pursuant to the academic relationship, to which the "right to control" agency test would not even apply, without the residency agreement. Gagliano v. Advanced Specialty Care , P.C. , supra, at 840-46, 145 A.3d 331. Ultimately, it concluded that the evidence established that only Gordon, not the hospital, controlled Bodavula's performance of the surgery. Id., at 843, 145 A.3d 331. Accordingly, it **754 reversed the judgment of the trial court as to the hospital. Id., at 851, 145 A.3d 331.
We granted the plaintiffs' petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly determine that the evidence admitted at trial was insufficient to support the jury's finding of actual agency ...." Gagliano v. Advanced Specialty Care, P.C. , 323 Conn. 926, 150 A.3d 229 (2016). The hospital filed a statement of an alternative ground for affirmance, renewing the legal claim that the Appellate Court did not reach.
I
We begin with the certified issue regarding evidentiary sufficiency. The plaintiffs contend that the Appellate Court improperly drew inferences against the verdict and tested the evidence against different and more demanding standards than the law under which the jury was charged. They further contend that the evidence supported the verdict under the charge given. We agree.
We review a trial court's denial of a motion to set aside the verdict and a motion for judgment notwithstanding the verdict under the same standard. "A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden. In reviewing the soundness of a jury's verdict, we construe the evidence in the light most favorable to sustaining the verdict.... We do not ask whether we would have reached the same result. [R]ather, we must determine ... whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict .... If the jury could reasonably have reached its conclusion, the verdict must stand." (Citations omitted; internal quotation marks omitted.) Pestey v. Cushman , 259 Conn. 345, 369-70, 788 A.2d 496 (2002) ; accord **755 Doe v. Hartford Roman Catholic Diocesan Corp. , 317 Conn. 357, 370-71, 119 A.3d 462 (2015). *593 In the absence of a challenge to the trial court's charge to the jury, as in the present case, that charge becomes the law of the case. See, e.g., A-G Foods, Inc. v. Pepperidge Farm, Inc. , 216 Conn. 200, 212, 579 A.2d 69 (1990). The sufficiency of the evidence must be assessed in light of that law of the case. Id.
The trial court's charge reflected the following principles. "The existence of an agency relationship is a question of fact"; Beckenstein v. Potter & Carrier, Inc. , 191 Conn. 120, 133, 464 A.2d 6 (1983) ; which "may be established by circumstantial evidence based upon an examination of the situation of the parties, their acts and other relevant information." Gateway Co. v. DiNoia , 232 Conn. 223, 240, 654 A.2d 342 (1995). Three elements are required to show the existence of an agency relationship: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." (Internal quotation marks omitted.) Beckenstein v. Potter & Carrier, Inc. , supra, at 133, 464 A.2d 6. Although stated as a three part test, this court has also acknowledged there are various factors to be considered "in assessing whether [an agency] relationship exists [which] include: whether the alleged principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the instrumentalities, tools, and the place of work; and the method of paying the agent.... In addition, [a]n essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal." (Citations omitted; internal quotation marks omitted.) Id.
**756 It is exclusively this third element-an understanding between the parties that the principal will be in control of the undertaking-on which the Appellate Court's decision rested and on which the hospital defends that decision.[3] Before turning to the evidence related to that element, two general points must be made.
First, there can be no doubt that the "undertaking" must include Bodavula's performance of the surgery. It is, after all, the sole negligent act on which liability was premised. Nonetheless, we agree with the plaintiffs that the "undertaking" properly can be viewed more broadly as the surgical residency, such that evidence related to the hospital's general right to direct and control Bodavula's conduct as a medical resident could bear on the hospital's right to control his surgical performance. See Standard Oil of Connecticut, Inc. v. Administrator, Unemployment Compensation Act , 320 Conn. 611, 623, 134 A.3d 581 (2016) ("The decisive test is who has the right to direct what shall be done and when and how it shall be done? Who has the right of general control?" [Emphasis added; internal quotation marks omitted.] ); Thompson v. Twiss , 90 Conn. 444, 447, 97 A. 328 (1916) (same). Nonetheless, additional facts might demonstrate that there was an abandonment or change of agency with regard to the particular act giving rise to liability. See, e.g., 1 Restatement (Second), Agency § 227, p. 500 (1958) ("Servant Lent to Another Master"). Indeed, this was precisely the theory that the hospital advanced to the jury in its opening and closing arguments.[4]
**757 *594 Second, it is only the general right to control, and not the actual exercise of specific control, that must be established. See Jagger v. Mohawk Mountain Ski Area, Inc. , 269 Conn. 672, 693 n.16, 849 A.2d 813 (2004) ("a fundamental premise underlying the theory of vicarious liability is that an employer exerts control, fictional or not, over an employee acting within the scope of employment, and therefore may be held responsible for the wrongs of that employee"); Heath v. Day Kimball Hospital , Superior Court, judicial district of Hartford, Complex Litigation Docket, Docket No. X04-CV-11-6026678-S (December 16, 2013) (57 Conn. L. Rptr. 381, 383, 2013 WL 6989523) ("the law does not require proof that the principal look over the agent's shoulder and direct the agent in how to do his work"). Agents may be vested with considerable discretion and independence in how they perform their work for the principal's benefit, yet still be deemed subject to the principal's general right to control. 1 Restatement (Third), Agency § 1.01, comment (c), p. 20 (2006) ("a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment"); see 1 Restatement (Second), supra, § 220 (2), comment (i), p. 489 (noting that "skilled artisans employed by a manufacturing establishment, many of whom are specialists, with whose method of accomplishing results the employer has neither the knowledge nor the desire to interfere, are servants"); 1 Restatement (Second), supra, § 220 (1), comment (d), p. 487 ("[T]he control or right to control needed to establish the relation of master and servant may be very attenuated. In some types of cases which involve persons customarily considered as servants, there may even be an understanding that the employer shall not exercise control. Thus, the **758 full-time cook is regarded as a servant although it is understood that the employer will exercise no control over the cooking."); see also Jefferson v. Missouri Baptist Medical Center , 447 S.W.3d 701, 712 (Mo. App. 2014) ("an employer's right to control may be attenuated, and an employee may have a significant degree of discretion in her work"); Brickner v. Normandy Osteopathic Hospital, Inc. , 746 S.W.2d 108, 115 (Mo. App. 1988) ("[l]iability premised on the theory of respondeat superior does not require [the] plaintiff to prove the employer had actual control over its employee's discretionary judgment as long as the employee's conduct is within the scope and course of employment"). Thus, the mere fact that resident physicians, like physicians generally, must be free to exercise independent medical judgment; see Jarmie v. Troncale , 306 Conn. 578, 606-609, 50 A.3d 802 (2012) ; does not preclude the trier of fact from finding the existence of a principal-agent relationship between a hospital and a resident physician. See Kelley v. Rossi , 395 Mass. 659, 663-64, 481 N.E.2d 1340 (1985) (resident physician can be servant of hospital even in absence of hospital's control over precise treatment decision).
With these principles in mind, we turn to the evidence proffered by the plaintiffs to establish the agency relationship between Bodavula and the hospital.
*595 That evidence emanates from three sources, not all of which were addressed, or fully explored, by the Appellate Court: the hospital house staff manual, witness testimony, and a hospital consent form signed by the plaintiff.[5] With regard to the manual, we underscore the **759 significance of the fact that the 231 page manual, in its entirety , was admitted as a full exhibit, specifically as relevant to the issue of agency. The hospital made no request for any limiting instruction as to its use; see Conn. Code Evid. § 1-4 ("Limited Admissibility"); and no witness testified regarding its application to the present circumstances.[6] Accordingly, the manual falls within the rule that "[a]n exhibit offered and received as a full exhibit is in the case for all purposes"; Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cole , 189 Conn. 518, 525, 457 A.2d 656 (1983) ; "and is usable as proof to the extent of the rational persuasive power it may have." (Internal quotation marks omitted.) State v. Chemlen , 165 Conn. App. 791, 817, 140 A.3d 347, cert. denied, 322 Conn. 908, 140 A.3d 977 (2016).
The manual included sections of general applicability to all residents and ones of specific applicability to surgical residents. The general sections set forth the following relevant mandates regarding structure of the clinic program, the program's goals, and the responsibilities of the hospital, the faculty, and the residents.
**760 With regard to general oversight, the manual provides that the hospital's executive vice president is charged with responsibility for the oversight and administration of the hospital's residency programs. A designated hospital official is "accountable for medical education." The hospital's medical education committee monitors all aspects of residency education and implements an internal review process.
With regard to day-to-day oversight, the manual provides that "[a]ll patient care must be supervised by qualified faculty."
*596 The hospital provides such faculty[7] to "ensure that residents receive appropriate supervision for all of the care they provide during their training." (Footnote added.)
The manual sets forth the following compact between the resident physicians and the faculty: "To meet their educational goals, resident physicians must participate actively in the care of patients and must assume progressively more responsibility for that care as they advance through their training. In supervising resident education, faculty must ensure that trainees acquire the knowledge and the special skills of their respective disciplines while adhering to the highest standards of quality and safety in the delivery of patient care services."
**761 The manual includes various faculty commitments to residents, including: "to ensure that resident physicians have opportunities to participate in patient care activities of sufficient variety and with sufficient frequency to achieve the competencies required by their chosen discipline"; to "provide resident physicians with opportunities to exercise graded, progressive responsibility for the care of patients"; and to "evaluate each resident's performance on a regular basis ...."
With regard to such evaluations and recourse, the manual provides that "[u]nsatisfactory [r]esident evaluation may result in required remedial activities, temporary suspension from duties, or termination of employment and residency education." The resident is afforded a multistep grievance procedure, the first step commencing with the chief resident and the final step terminating with the designated institutional official for the hospital's executive vice president.
In the section of the manual specific to the surgical residency program, the hospital touts the program as an opportunity to use the latest, cutting edge techniques, technology and equipment. Residents rotate among four surgical services. One rotation specifically mentions the performance of hernia surgeries. While on their rotations, residents are provided with "the opportunity for complex open and minimally invasive surgical cases." The chief resident sets the precise structure of the rotation with guidance from the attending staff, the hospital's surgery chairman, the hospital residency liaison and the Sound Shore Medical Center program director.
"Surgical residents are expected to ... [s]afely and correctly perform appropriate diagnostic and surgical procedures." Residents' "[m]anual dexterity [is] evaluated in the operating room and on the surgical floors by [a]ttending [s]urgeons and [c]hief [r]esidents as **762 reflected by operative technique, performance of basic bedside procedures and quality of assistance during complex operative procedures." Surgical skills evaluation forms are used by faculty to make these assessments. *597 The plaintiffs' standard of care expert, Thomas H. Gouge, testified that accreditation for a clinical setting requires that residents be subject to the setting's quality control. Gouge also testified that a teaching hospital benefits from a residency program because it affords such hospitals "highly trained, low cost" physicians to assist nurses and to provide patient care around the clock.
Other proffered evidence demonstrated how the aforementioned obligations and procedures played out with regard to the plaintiff's surgery. A hospital consent form signed by the plaintiff prior to her surgery authorized a surgical resident to participate in performing part of the surgery. The consent form prominently displayed the hospital's name and logo; it provided no other indicia that residents or medical support positions listed on the form had any other affiliation.
Testimony from Bodavula and Gordon established the following facts. The chief surgical resident assigned Bodavula to the plaintiff's surgery. Gordon did not request a resident and did not need a second surgeon to assist him. Gordon did not believe that it was in his patient's best interest to allow a resident to participate, but he did so to advance the hospital's expectation of involving its residents to the extent that it was safe to do so. Gordon understood that part of his responsibility as clinical faculty included his evaluation of resident performance. He acknowledged that, once a resident shows up in the operating room, he puts on the additional hat of being clinical faculty.
**763 Before commencing the surgery, the surgical team followed the hospital's safety checklist protocol. Gordon believed that use of the optical trocar was part of Bodavula's educational experience. Gordon provided Bodavula with instruction and supervision on the use of that device while Bodavula performed the surgical procedure.
This evidence provides a sufficient basis for the jury to have concluded that the hospital had the general right to control Bodavula as a resident, such that he was the hospital's actual agent prior to and after he entered the operating room. The hospital agreed to oversee the provision of a specific medical education for residents in exchange for the provision of low cost labor and the prestige attached to being a teaching hospital. The hospital fulfilled that obligation by implementing systems whereby residents were provided opportunities to participate in progressively more difficult tasks, charging its faculty with executing that mission. Hospital officials overseeing the program had the right to constrain the activities in which Bodavula could participate and to take disciplinary action against him should he fail to provide patient care that satisfied the hospital's standards, which in turn could jeopardize his ability to complete the residency program and become a board certified surgeon.
A reasonable inference from the evidence is that the chief surgical resident who assigned Bodavula to the plaintiff's surgery also was acting in furtherance of the hospital's obligations to surgical residents. The chief resident's alignment with the hospital was established by his or her place in the hospital's chain of command in resolving grievances, as well as his or her status as a member of the same pool of residents as Bodavula. To the extent that the manual suggested that the chief surgical resident also was acting for Sound View Medical Center, the goals of both entities appear to be **764 squarely aligned such that the chief resident could act for both. See 1 Restatement (Second), supra, § 226, p. 498 ("[a] person may be the servant of two masters, not joint employers, *598 at one time as to one act, if the service to one does not involve abandonment of the service to the other"); id., § 236, comment (a), p. 523 ("[a]lthough a person cannot, by the same act, properly serve two masters whose wills are opposed, he may, as stated in [§] 226, serve two masters both of whom are interested in the performance of the same act").
Moreover, it was eminently reasonable for the jury to conclude that Gordon was charged with fulfilling the hospital's obligation to afford surgical residents with the opportunity to participate in progressively more difficult surgical procedures. Gordon was acting in his capacity as hospital faculty when he allowed Bodavula to participate in the surgery. Although Gordon could dictate the extent of that participation, Gordon was not acting as Bodavula's principal, as it was not to Gordon's benefit to allow Bodavula to conduct part of the surgery. However, even if Gordon could be deemed to have derived some benefit insofar as his admitting privileges may have been conditioned on acting as clinical faculty, the jury was charged that Bodavula could be an agent for two principals.[8] The mere fact that the hospital did not dictate the precise conditions under which Gordon could permit Bodavula to participate in the surgery or the limits thereto does not compel the conclusion that the hospital surrendered its general right to control Bodavula's participation in such procedures. As we **765 previously indicated, there is ample authority recognizing that agents may be vested with considerable discretion and independence in how they perform their work for the principal's benefit, yet still be deemed subject to the principal's general right to control.
Finally, we observe that the jury's verdict is in accord with case law from other jurisdictions. For example, the court in Brickner v. Normandy Osteopathic Hospital, Inc. , supra, 746 S.W.2d at 112, 115, concluded there was sufficient evidence to support a jury's finding that a second year resident was acting as a servant of a hospital despite that, at the time of the negligence, he was supervised by an attending physician who participated in the hospital's teaching program. That court explained: "The hospital hired [the resident physician] and allowed him to practice his medical skills by performing operations such as the one performed on [the patient]. [The resident's] employment was controlled by the hospital's 'Department of Surgery Resident's Training Program' syllabus, which set forth in detail the duties of a resident physician .... Failure to satisfactorily perform any of his duties, including the performance of his surgical duties, could result in the hospital terminating his employment.... [A]t the time of surgery, [the resident] was performing the very work for which the hospital had hired and was paying him.[9] ... [The hospital] exercised *599 control of each step over a resident physician's progress toward surgical certification. Throughout his resident training program, the hospital directed [the resident's] activities and **766 authorized him to perform increasingly complex procedures. The hospital reaped the benefit of [the resident's] labor during his training period. While it did not and could not dictate [the resident's] every move while in surgery, the hospital had supervisory control over his performance as a resident and could at any time dismiss him for poor exercise of his medical judgment. Liability premised on the theory of respondeat superior does not require [the] plaintiff to prove the employer had actual control over its employee's discretionary judgment as long as the employee's conduct is within the scope and course of employment." (Citations omitted; footnote added.) Id., at 114-15 ; see also Jack & Jill, Inc. v. Tone , 126 Conn. 114, 119, 9 A.2d 497 (1939) (right of discharge is strong indicator of master-servant relationship); Nordland v. Poor Sisters of St. Francis Seraph of Perpetual Devotion , 4 Ill. App. 2d 48, 50, 55-57, 123 N.E.2d 121 (1954) (hospital intern employee was not independent contractor for purposes of workers' compensation because hospital maintained control of intern even when intern assisted in operating room). The hospital has brought no authority to our attention that compels a contrary conclusion.
Accordingly, we conclude that the Appellate Court improperly held that the evidence was insufficient to support the jury's finding of actual agency.
II
We therefore turn to the hospital's alternative ground for affirmance. Specifically, the hospital contends that it was not legally permitted to control the professional judgment of a physician under Connecticut's statutory scheme regarding physicians and hospitals.[10] The **767 gravamen of the hospital's argument is that, because it is not licensed to practice medicine, it cannot (1) directly engage in the practice of medicine, or (2) indirectly engage in the practice of medicine through licensed employees or agents. Thus, it posits that it cannot be vicariously liable for Bodavula's negligence because, as a matter of law, it was precluded, directly and indirectly, from exercising any control over his surgical performance.[11] *600 This presents a question of law, which we review de novo. See, e.g., Batte-Holmgren v. Commissioner of Public Health , 281 Conn. 277, 294, 914 A.2d 996 (2007). We are not persuaded.
We recently rejected effectively the same argument in Cefaratti v. Aranow , 321 Conn. 593, 141 A.3d 752 (2016), albeit in the context of liability under the theory of apparent agency. There, it was argued that "[a] hospital cannot practice medicine and therefore cannot be **768 held directly liable for any acts or omissions that constitute medical functions." (Internal quotation marks omitted.) Id., at 610, 141 A.3d 752. In rejecting this argument, we stated that "it has never been the rule in this state that hospitals cannot be held vicariously liable for the medical malpractice of their agents and employees. To the contrary, this court, the Appellate Court and the Superior Court have consistently assumed that the doctrine of respondeat superior may be applied to hold hospitals vicariously liable for the medical malpractice of their agents and employees." (Footnote omitted.) Id., at 610-11, 141 A.3d 752 ; see, e.g., Weiss v. Surgical Associates, P.C. , Superior Court, judicial district of Fairfield, Docket No. CV-11-6022546-S, 2015 WL 3516842 (April 30, 2015) (rejecting hospital's argument that it cannot legally exert requisite control necessary to establish agency relationship because it was not created under General Statutes for purpose of practicing medicine); Noel v. Lawrence & Memorial Hospital , 53 Conn. Supp. 269, 287-88 (2014) (subjecting hospitals to claims of vicarious liability "does not mean that hospital corporate entities are making individualized medical judgments ... [only] that hospitals are responsible for the negligence of the doctors who do make them"). We see no reason why Cefaratti would not dispose of the hospital's argument in the present case.
Neither the hospital nor the amici curiae that have filed briefs in support of the hospital on this issue have asked this court to overrule or limit Cefaratti . Indeed, they did not acknowledge the case in their briefs to this court; nor did the hospital address it at oral argument, despite the fact that the plaintiffs' reply brief substantially relied on it to respond to the alternative ground for affirmance. Insofar as they advance arguments that could bear on the question of whether Cefaratti reflects sound public policy, we are not persuaded by such arguments. Holding hospitals vicariously liable continues to support this state's sound public policy of **769 encouraging hospitals to formulate and implement effective quality control policies and to exercise better oversight of their employees and agents. We know of no authority to support the proposition that shifting such responsibility to a teaching hospital will, as the amicus curiae Connecticut Hospital Association claims, have an undue chilling effect on the number and scope of residency training opportunities. The evidence established that teaching hospitals receive direct financial benefits, including federal funding for, among other expenses, resident salaries, benefits, and professional liability insurance. Teaching hospitals also receive indirect benefits such as prestige in the health care community, and a group of highly trained, low cost physicians who can provide care to patients *601 in the hospital twenty-four hours a day, seven days a week. As the amicus curiae Connecticut Center for Public Safety points out, national rankings suggest that teaching hospitals are viewed as delivering a higher quality of care, and obtaining better results, than other hospitals. See A. Comarow & B. Harder, "2017-18 Best Hospitals Honor Roll and Overview," U.S. News & World Report (August 8, 2017), available at https://health.usnews.com/health-care/best-hospitals/articles/best-hospitals-honor-roll-and-overview (last visited August 2, 2018).
Finally, we underscore that the question before us is not whether residents or physicians generally are per se agents of hospitals. Rather, it is simply whether there was sufficient evidence in the present case to support the jury's finding that Bodavula was the hospital's actual agent. Given the unfettered use that the jury was permitted to make of the manual and other evidence, we are persuaded that there was sufficient evidence to support the jury's finding of actual agency. Similarly, we decline to create a per se rule that would absolve teaching hospitals of liability for the negligent acts of their employees and agents.
**770 The judgment of the Appellate Court is reversed only with respect to the hospital's liability and the case is remanded to that court with direction to affirm the judgment of the trial court; the judgment of the Appellate Court is affirmed in all other respects.
In this opinion the other justices concurred.

As we explain later in this opinion, a consent form signed by the plaintiff was admitted into evidence in which the hospital informed her of the possibility that a resident might assist in portions of the surgery.

The jury found that Bodavula was not an apparent agent of the hospital. The jury was instructed in relevant part that apparent agency could exist "if the plaintiff accepted services from [Bodavula] in the reasonable belief that [Bodavula] worked for [the hospital] or was supervised or controlled by the hospital ...." As we previously indicated, there was no evidence that the plaintiff knew that Bodavula was in fact going to perform part of the surgery.

As we explain later in this opinion, there was undisputed evidence submitted regarding the benefits to the hospital from the residency program generally and the residents' provision of medical care to the hospital's patients specifically.

In opening argument, the hospital's counsel stated: "It is true that you may find that [Bodavula] for certain purposes was an agent of the hospital. The bigger question is ... when he stepped into that surgical arena , into that operating room with [Gordon], did he remain-if indeed that was your conclusion, did he remain the agent of the hospital ." (Emphasis added.) During closing argument, counsel stated that he "acknowledge[d] that for many purposes at [the hospital, Bodavula] may well have been an agent.... Not for this purpose ...."

The Appellate Court placed substantial weight on the plaintiffs' failure to proffer the residency agreement. Although a residency agreement may be significant evidence relevant to the presence or absence of an agency relationship, we have never held that the failure to produce such an agreement precludes a finding of agency. Gupta v. New Britain General Hospital , supra, 239 Conn. 574, 687 A.2d 111, on which the Appellate Court relied for its view, is inapposite. In Gupta , a physician brought an action challenging his dismissal from a hospital's surgical residency training program. Id., at 575, 687 A.2d 111. The physician claimed that the dismissal was a breach of the residency agreement, which he claimed was an employment contract. Id., at 580, 687 A.2d 111. Therefore, the terms and characterization of that agreement were necessarily essential to the resolution of that case.
We also note that the Appellate Court's reliance on the hybrid academic and employment functions of a medical residency cited in Gupta should have had no bearing on the present case. This distinction was not advanced in the trial court proceedings; there was no request for a jury charge setting forth different standards for agency depending on which function Bodavula was undertaking when the negligent act occurred, as the Appellate Court suggested. See A-G Foods, Inc. v. Pepperidge Farm, Inc. , supra, 216 Conn. at 212, 579 A.2d 69 (claim of insufficient evidence must be examined in light of law of case, as charged to jury).

After it became apparent to the plaintiffs that neither Bodavula nor Gordon had the requisite knowledge to lay a foundation for admission of the manual, a discussion ensued off the record about calling a hospital official as a witness to do so. After it was revealed that the official was unavailable to testify in the near term, the hospital stipulated that the manual could come in as a full exhibit. Accordingly, insofar as the Connecticut Hospital Association, in its amicus brief, attempts to limit the meaning or application of certain parts of the manual, we do not consider these arguments.

The manual does not define "faculty" and provides no information as to the contours of the relationship between the hospital and its faculty. Nonetheless, Gordon admitted in his testimony that, insofar as the manual refers to faculty, it would be referring to the teaching faculty at the hospital, which would have included him with regard to the surgical residency program in 2008. He also acknowledged that, although he could not recall receiving the manual, the manual's recitation of the faculty's general responsibilities was consistent with Gordon's understanding of his role at the hospital as clinical faculty.
Gordon also indicated that, in connection with the surgical residency program in 2008, he had no written agreement to serve in that capacity, and was not paid to perform in that capacity. He indicated that there was a "cultural understanding" that attending surgeons would teach residents. According to Gordon, the hospital executed a formal agreement with him to serve as faculty in 2010.

The jury was given the following instruction: "A person may be the agent of two principals at the same time, so long as his service to one does not involve abandonment of his service to the other. The fact that a principal has permitted a division of control, does not lead to an inference he has surrendered it." This instruction was in accord with § 226 of the Restatement (Second) of Agency. See also 1 Restatement (Second), supra, § 227 ("Servant Lent to Another Master"); 1 Restatement (Second), supra, § 236 ("Conduct Actuated by Dual Purpose").

There was conflicting evidence as to whether the hospital paid Bodavula's salary. The manual indicated that it paid residents' salaries, but Bodavula testified that the hospital did not pay him. Putting aside the principle that we are required to conclude that the jury credited the manual over Bodavula because such a conclusion lends stronger support to the verdict, we note that there was no evidence to discount provisions in the manual indicating that the hospital provided numerous other financial benefits, in kind or direct, including meal allowances, housing, insurance, and uniforms.

The hospital points out that, by statute, two types of corporate entities permissibly can engage physicians to practice medicine as their employees or agents: professional service corporations; see General Statutes § 33-182a et seq. ; and medical foundations. See General Statutes § 33-182aa et seq. The hospital asserts that it is neither type of entity.

Contrary to the hospital's argument, Lieberman v. Connecticut State Board of Examiners in Optometry , 130 Conn. 344, 34 A.2d 213 (1943), does not support the conclusion that a hospital cannot be held vicariously liable for the negligence of its agents and employees, and that case does not adopt the corporate practice of medicine doctrine. Lieberman concerned the revocation of an optometrist's license on the basis of his business and compensation structure with a corporation that sold optical goods. A considerable portion of the optometrist's compensation came from commissions he received from the corporation based on his sale of the corporation's glasses to patients to whom he had issued optical prescriptions. Id., at 351, 34 A.2d 213. This court found that the situation compromised the undivided loyalty an optometrist owes to his patient, as the optometrist might be tempted to act contrary to the true interests of the patient by unnecessarily prescribing glasses or more expensive glasses. Id. This court also found that the store's advertising, done with the knowledge of the optometrist, could create in the public mind the belief that the corporation, and not the optometrist, was offering to render optometric services. Id., at 353, 34 A.2d 213. Although the board of examiners revoked his license in part on the basis of a finding that the optometrist's actions assisted the corporation in the unlicensed practice of optometry, this court did not reach that ground on appeal. Id., at 345, 353, 34 A.2d 213. This court upheld the revocation based solely on a finding that the optometrist engaged in unprofessional conduct because his compensation structure could have impaired his independent judgment and undivided loyalty to patients. Id.